IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION II

| | |
|---|---|
| OLYMPIC STEWARDSHIP FOUNDATION, J. EUGENE FARR, WAYNE and PEGGY KING, ANNE BARTOW, BILL ELDRIDGE, BUD and VAL SCHINDLER, RONALD HOLSMAN, CITIZENS' ALLIANCE FOR PROPERTY RIGHTS LEGAL FUND, MATS MATS BAY TRUST, JESSE A. STEWART REVOCABLE TRUST, CRAIG DURGAN, and HOOD CANAL SAND & GRAVEL, d/b/a THORNDYKE RESOURCES, | No. 47641-0-II |
| Petitioners, | |
| v. | |
| STATE OF WASHINGTON ENVIRONMENTAL AND LAND USE HEARINGS OFFICE, acting through the WESTERN WASHINGTON GROWTH MANAGEMENT HEARINGS BOARD, STATE OF WASHINGTON DEPARTMENT OF ECOLOGY, JEFFERSON COUNTY, and THE HOOD CANAL COALITION, | PART PUBLISHED OPINION |
| Respondents. | |

JOHANSON, J. — The subject of this appeal is Western Washington Growth Management

Hearings Board's (Board) final decision and order that upheld Jefferson County's 2014 Shoreline

Master Program (Master Program). Olympic Stewardship Foundation (OSF), Citizen's Alliance

for Property Rights Jefferson County (CAPR), et al., and Hood Canal Sand and Gravel (S&G)

appeal various aspects of the Board's decision. The appellants raise numerous and largely separate and distinct issues. Thus, in the published portion of the opinion, after providing brief background information and general standards of review, we address OSF's issues in Part One, CAPR's issues in Part Two, and S&G's issues in Part Three. We address the appellants' remaining arguments in Parts One, Two, and Three of the unpublished portion of the opinion respectively. Finding no error in the Board's decision, we affirm.

## BACKGROUND

Since 1974, Jefferson County (the County) has had several Master Programs. Under the Shoreline Management Act of 1971 (SMA),[1] each County is required to adopt and administer a Master Program. *Citizens for Rational Shoreline Planning v. Whatcom County*, 172 Wn.2d 384, 387, 258 P.3d 36 (2011). A Master Program is a combination of planning policies and development regulations that addresses shoreline uses and development. WAC 173-26-020(24), -186.

In 2003, the Department of Ecology (DOE) formally adopted guidelines (Master Program guidelines) for the development and approval of new and updated Master Programs by local governments.[2] Ch. 173-26 WAC. The SMA and the Master Program guidelines afford substantial discretion to local governments to adopt Master Programs that reflect local circumstances. WAC 173-26-171(3)(a). But Master Programs must comply with Master Program guidelines and will

---

[1] Ch. 90.58 RCW.

[2] The DOE acts "primarily in a supportive and review capacity with an emphasis on providing assistance to local government and on insuring compliance with the policy and provisions of this chapter." RCW 90.58.050.

not be effective until reviewed and approved by the DOE. RCW 90.58.080(1), .090. A Master Program becomes part of Washington's shoreline regulations once approved by the DOE. *Citizens for Rational Shoreline Planning*, 172 Wn.2d at 392. The Board hears challenges to the DOE approval of Master Programs or amendments. RCW 90.58.190(2)(a).

In January 2004, the legislature mandated that all jurisdictions update their Master Programs by 2014. Ch. 173-26 WAC; RCW 90.58.080(7).

In 2005, the County initiated the Master Program amendment process. The County's Department of Community Development (DCD) formed two advisory committees to assist staff and consultants with planning and executing the Master Program amendment process. The DCD formed the Shoreline Technical Advisory Committee to compile and review current scientific and technical information. The DCD also established a Shoreline Policy Advisory Committee to assist with the development of goals, policies, and regulations based on the scientific and technical information. Between 2006 and 2008, the DCD informed the public about the update through e-mail and through numerous open public events to ensure public participation in the amendment process and provide the public with opportunities to comment on the Master Program.

In preparation for the Master Program amendment, the DCD staff worked with an outside consultant and the Shoreline Technical Advisory Committee to prepare the November 2008 "Final Shoreline Inventory and Characterization Report" (SI). The SI was based on over 200 sources, many of which focused on Western Washington and the Puget Sound and some discussed marine environments. The DOE provided technical support to the County for preparing the SI by

conducting a detailed watershed characterization[3] of East Jefferson County using a landscape analysis. This analysis identified areas that were the most important to maintaining ecosystems; areas that degraded the ecosystems because of human-caused alterations; and areas that were best suited for protection, development, and/or restoration.

A 2004 report relied on by the SI documented pollution from toxic substances, runoff from rainwater, loss of habitat, and declines in key parts of the food web ecology in many areas of the Puget Sound. The report further noted that the region's population was expected to grow by another 1.4 million people over the next 15 years.

The SI stated that the County's shoreline contains critical habitats and is home to numerous threatened and endangered species, including declining salmonid species. From that evaluation, the SI concluded that "virtually all of the County's nearshore marine environment supports or has the potential to support highly valuable and ecologically sensitive resources." Administrative Record (AR) at 6273.

The SI evaluated key species, habitats, and ecosystems in specific areas in the county shoreline. The SI also described development adjacent to individual shoreline segments, including the armoring,[4] marinas, beach access stairs, docks, and other structures for each shoreline area. In addition, the SI included a large map folio detailing the characteristics of the County's state

---

[3] "'Watershed' means a geographic region within which water drains into a particular river, stream or body of water." Jefferson County Code (JCC) 18.25.100(23)(h).

[4] "'Shore armoring' or 'structural shoreline armoring' refers to the placement of bulkheads and other hard structures on the shoreline to provide stabilization and reduce or prevent erosion caused by wave action, currents and/or the natural transport of sediments along the shoreline. Groins, jetties, breakwaters, revetments, sea walls are examples of other types of shoreline armoring." JCC 18.25.100(19)(l).

shorelines including marine and freshwater shoreline planning areas, water flows for rivers and streams, soil types, channel migration zones and flood plains, areas designated as critical areas and critical shoreline habitats, and the locations of aquatic vegetation, shoreline use patterns, and shellfish harvesting areas.

In the SI report, the County designated S&G's shoreline property as a "conservancy" area based on the property's environmental attributes, including: high-functioning shoreline resources with a low degree of modification or stressors, the presence of salmonid habitats, the presence of erosive or hazardous slopes, and the presence of commercial shellfish beds.

A 2009 action agenda by the Puget Sound Partnership identifies six broad categories of threats to the region's ecology, including habitat alteration, pollution, surface/groundwater impacts, artificial propagation, harvest, and invasive species. The agenda notes that these issues are likely to be exacerbated in the future by climate change and population growth.

In February 2010, the DCD staff and consultants prepared the "Cumulative Impacts Analysis" (CIA). The CIA assessed the total collective effects that the goals, policies, shoreline designations, and regulations proposed in the locally approved Master Program (Draft Master Program) would have on shorelines if all allowed use and development occurred.

In March 2010, the DCD sent the Draft Master Program to the DOE for review. The DOE also considered and sent comments about the CIA to the Jefferson County Board of Community Commissioners (Commissioners). In January 2011, the DOE concluded that the County met the SMA's procedural and policy requirements and announced conditional approval of the Draft Master Program with some required and recommended changes along with findings and conclusions to support the decision. After further edits and communication with the DOE, the

Commissioners approved and adopted the County's final Master Program in December 2013. In February 2014, the DOE approved the Master Program and it became effective. The Master Program is codified at ch. 18.25 Jefferson County Code (JCC).[5]

Appellants OSF, CAPR, and S&G (collectively petitioners) each timely filed petitions for review with the Board to challenge the County's Master Program. The Board consolidated the petitions and conducted a hearing on the merits. On March 16, 2015, the Board upheld the Master Program, denied all of the petitioners' claims, and dismissed their petitions. Petitioners appealed to the Jefferson County Superior Court in April. In September 2015, upon a motion by the DOE that was supported by the County, we granted direct review removing the petitions from the superior court. Petitioners appeal the Board's decision and order.[6]

ANALYSIS

LEGAL PRINCIPLES[7]

A. THE GROWTH MANAGEMENT HEARINGS BOARD

Challenges to a Master Program are governed by the SMA and are adjudicated by the Board. RCW 90.58.190(2)(a). The Board is charged with ensuring that Master Programs comply

---

[5] Specific provisions of the Master Program contested by petitioners are not included in the fact section but are included in the analysis sections in which they are discussed.

[6] Two organizations, Futurewise and the Washington Environmental Council, filed an amicus brief in which they argue that the Board properly evaluated and upheld the Master Program. Pacific Legal Foundation also filed an amicus brief in which they argue that the Board's decision should be reversed because the Board improperly interpreted the SMA and concluded that the necessary showing was made for the imposition of riparian buffers.

[7] These standards of review and rules of law are applied throughout the opinion.

with the Growth Management Act (GMA),[8] the SMA, and the DOE guidelines. RCW 36.70A.280; RCW 90.58.190(2), .200, .060; WAC 173-26-171 through -251.

A petitioner has the burden of proof in any appeal to the Board for review of the DOE's approval of a Master Program or amendment. RCW 90.58.190(2)(d). Where a challenge is to provisions regulating *shorelines of statewide significance (SSWS),* "the board shall uphold the decision by the [DOE] *unless the board, by clear and convincing evidence*, determines that the decision of the [DOE] is noncompliant with the policy of [the SMA] or the applicable guidelines, or chapter 43.21C RCW as it relates to the adoption of master programs." RCW 90.58.190(2)(c).

If a challenge is to provisions regulating *shorelines* not in the SSWS category, the Board shall review the proposed Master Program "solely for compliance with the requirements" of the SMA, the applicable Master Program guidelines, and other internal consistency provisions from the GMA. RCW 90.58.190(2)(b). With respect to provisions affecting only shorelines, a petitioner must establish that the provisions at issue are "*clearly erroneous*" in view of the entire record before the Board. RCW 36.70A.320(3) (emphasis added).

The County has shorelines falling under both categories. The Board thus examined the County's Master Program under both SSWS and shoreline scopes of review and applicable burdens of proof.

### B. ADMINISTRATIVE PROCEDURE ACT

The Administrative Procedure Act (APA), ch. 34.05 RCW, governs judicial review of challenges to actions by growth management hearings boards. RCW 34.05.570; *Quadrant Corp.*

---

[8] Ch. 36.70A RCW.

*v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 154 Wn.2d 224, 233, 110 P.3d 1132 (2005).  Under

the APA, the party asserting invalidity bears the burden of establishing the invalidity.  *Quadrant*

*Corp.*, 154 Wn.2d at 233.

The decision is invalid if it suffers from at least one of nine enumerated infirmities.  RCW

34.05.570(3).  We must grant relief from the decision if

> (a)  [t]he order, or the statute or rule on which the order is based, is in violation of constitutional provisions on its face or as applied;
> . . . .
> (d)  The agency has erroneously interpreted or applied the law;
> (e)  The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter;
> . . . .
> (i)  The order is arbitrary or capricious.

RCW 34.05.570(3).

We give due deference to the Board's specialized knowledge and expertise.  *Buechel v.*

*Dep't of Ecology*, 125 Wn.2d 196, 202-03, 884 P.2d 910 (1994).

We apply the substantial evidence review standard to challenges to the Board's factual

findings under RCW 34.05.570(3)(e) to determine if there is a sufficient quantity of evidence to

persuade a fair-minded person of the truth or correctness of the order.  *Spokane County v. E. Wash.*

*Growth Mgmt. Hr'gs Bd.*, 176 Wn. App. 555, 565, 309 P.3d 673 (2013).  We view the evidence in

the light most favorable to the party which prevailed in the highest forum that exercised fact-

finding authority, and we give deference to the Board's factual findings.  *DeFelice v. Emp't Sec.*

*Dep't*, 187 Wn. App. 779, 787, 351 P.3d 197 (2015).

We apply the arbitrary and capricious review standard to challenges under RCW

34.05.570(3)(i), determining whether the decision constitutes willful and unreasoning action taken

without regard to or consideration of the facts and circumstances surrounding the action. *Spokane County*, 176 Wn. App. at 565-66. If there is room for two opinions, action taken after due consideration is not arbitrary and capricious even if a reviewing court may believe it to be erroneous. *Spokane County*, 176 Wn. App. at 566.

We review de novo a challenge under RCW 34.05.570(3)(d) that asserts that the Board erroneously interpreted or applied the law. *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998). In doing so, "'[w]e accord deference to an agency interpretation of the law where the agency has specialized expertise in dealing with such issues, but we are not bound by an agency's interpretation of a statute.'" *Quadrant Corp.*, 154 Wn.2d at 233 (alteration in original) (quoting *City of Redmond*, 136 Wn.2d at 46).

"Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998). We also do not consider claims unsupported by legal authority, citation to the record, or argument. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

PART ONE – OSF APPEAL

OSF appeals the Board's final decision and order that upheld Jefferson County's 2014 Master Program. Specifically, OSF argues that (1) the Board's decision to uphold the Master Program is based on an erroneous SMA interpretation, (2) the Board erred when it approved the Master Program because it did not comply with several provisions of the SMA, and (3) the Board erred when it upheld the Master Program "no-net-loss" requirement for permit applicants because that requirement conflicts with the SMA by improperly restricting development and the SMA "minimization standard" must control instead. We reject OSF's arguments.

ANALYSIS

I. BOARD PROPERLY INTERPRETED THE SMA

First, OSF argues that the Board's decision to uphold the Master Program is based on an erroneous SMA interpretation that private property rights are secondary to the SMA's purpose of protecting the environment.  We disagree.

A. APPLICABLE LAW

The SMA's policy and use preference for shorelines is detailed in RCW 90.58.020:

The legislature finds that the shorelines of the state are among the *most valuable and fragile of its natural resources* and that there is great concern throughout the state *relating to their utilization, protection, restoration, and preservation*.  In addition it finds that ever increasing pressures of additional uses are being placed on the shorelines necessitating increased coordination in the management and development of the shorelines of the state. . . .
. . . This policy contemplates protecting against adverse effects to the public health, the land and its vegetation and wildlife, and the waters of the state and their aquatic life, while protecting generally public rights of navigation and corollary rights incidental thereto.
The legislature declares *that the interest of all of the people* shall be paramount in the management of shorelines of statewide significance.  The [DOE], in adopting guidelines for shorelines of statewide significance, and local government, in developing master programs for shorelines of statewide significance, shall give preference to uses in the following order of preference which:
(1) Recognize and protect the statewide interest over local interest;
(2) Preserve the natural character of the shoreline;
(3) Result in long term over short term benefit;
(4) *Protect the resources and ecology of the shoreline*;
(5) Increase public access to publicly owned areas of the shorelines;
(6) Increase recreational opportunities for the public in the shoreline;
(7)  Provide for any other element as defined in RCW 90.58.100 deemed appropriate or necessary.
In the implementation of this policy the public's opportunity to enjoy the physical and aesthetic qualities of natural shorelines of the state shall be preserved to the greatest extent feasible consistent with the overall best interest of the state and the people generally.  *To this end uses shall be preferred which are consistent with control of pollution and prevention of damage to the natural environment, or are unique to or dependent upon use of the state's shoreline.*

(Emphasis added.)

This SMA policy is also informed by the State Environmental Policy Act (SEPA), ch. 43.21C RCW, which states that "to the fullest extent possible: (1) [t]he policies, regulations, and laws of the state of Washington shall be interpreted and administered in accordance with the policies set forth in this chapter." RCW 43.21C.030. Among the SEPA policies applicable to the SMA are the recognition of "the responsibilities of each generation as trustee of the environment for succeeding generations," RCW 43.21C.020(2)(a), and the recognition that "each person has a fundamental and inalienable right to a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment." RCW 43.21C.020(3). *Accord Puget Soundkeeper All. v. Pollution Control Hr'gs Bd.*, 189 Wn. App. 127, 148, 356 P.3d 753 (2015).

The Master Program guidelines direct how the SMA policy provision should be implemented. For example, the Master Program guidelines state that single-family residences are a priority use for shoreline development "*when developed in a manner consistent with control of pollution and prevention of damage to the natural environment*." WAC 173-26-241(3)(j) (emphasis added). The Master Program guidelines acknowledge that any development, including residential development, may cause significant damage to the shoreline and provides that Master Programs must mitigate such environmental damage. WAC 173-26-241(3)(j). Specifically, the Master Program guidelines state, "Master programs shall include policies and regulations that *assure no net loss of shoreline ecological functions* will result from residential development." WAC 173-26-241(3)(j) (emphasis added). The concept of "no net loss" is incorporated into the SMA and elsewhere in the Master Program guidelines. RCW 90.58.620; WAC 173-26-186(8).

11

B.  NO ERRONEOUS INTERPRETATION

OSF argues that the Board's decision to uphold the Master Program was based on an erroneous interpretation of the SMA that property rights are secondary to the primary goal of protecting, restoring, and enhancing the environment.  OSF specifically challenges two passages of the Board's decision.

The first statement that OSF challenges is that private property rights are secondary to the SMA's primary purpose of protecting state shorelines as fully as possible.  However, OSF ignores that the statement is consistent with our interpretation of the SMA.  The Board's statement is a quote from *Samson v. City of Bainbridge Island*, which states, "[C]ontrary to the appellant's claims that RCW 90.58.020 states a policy of protecting private property rights, . . . private property rights are 'secondary to the SMA's primary purpose, which is to protect the state shorelines as fully as possible.'"  149 Wn. App. 33, 49, 202 P.3d 334 (2009) (internal quotation marks omitted) (quoting *Lund v. Dep't of Ecology*, 93 Wn. App. 329, 336-37, 969 P.2d 1072 (1998)).  *Samson* refutes the general idea that the SMA must always prioritize private property rights.

The Board properly quoted *Samson* to support its analysis that even though single-family homes are one of the priority uses under the SMA, the County may still restrict structures or uses on residential property in furtherance of ecological protection goals.  In fact, reasonable and appropriate uses should be allowed on the shorelines only if they will result in no net loss of shoreline ecological functions and systems.  *See* RCW 90.58.020; WAC 173-27-241(3)(j).  The Board's quotation of *Samson* does not demonstrate that the Board erroneously interpreted the SMA.

The second passage that OSF challenges states,

> [T]he Board finds that RCW 90.58.020 establishes state policy to manage shorelines with an emphasis on the maintenance, protection, restoration, and preservation of "fragile" shoreline "natural resources," "public health," "the land and its vegetation and wildlife," "the waters and their aquatic life," "ecology" and "environment."

AR at 7483. But this language comports with the SMA policy provision quoted above. *See* RCW 90.58.020. We hold that the two passages OSF relies on do not demonstrate that the Board erroneously interpreted the SMA.[9]

## II. MASTER PROGRAM COMPLIES WITH SMA

OSF argues that the Board erred when it approved the Master Program because the Master Program did not comply with the SMA. Specifically, OSF argues that the Board erred when it upheld (1) the Master Program's designation of all the county shorelines as "critical areas" and (2) the Master Program's imposition of a 150-foot standard marine buffer.[10] These arguments fail.

### A. INCORPORATION OF COUNTY'S CRITICAL AREAS ORDINANCE INTO THE MASTER PROGRAM

First, OSF argues that the Board erred when it upheld the Master Program because the Master Program incorporated the County's 2000 "Critical Area Ordinance" (CAO) designation of all shorelines as "critical areas" without proper review of the CAO by the DOE, which violates the SMA. We reject these arguments.

---

[9] OSF also argues that the Board's interpretation of the SMA conflicts with law from numerous cases that hold that "while the SMA emphasizes protection of natural shorelines, it simultaneously allows for development, expressing the intent to protect private property rights." Br. of Appellant (OSF) at 22. This argument is unpersuasive because as analyzed above, the two passages from the Board decision do not conflict with the SMA's balancing of preservation and development.

[10] OSF concedes in its reply that the County has general authority to update the Master Program. We accept OSF's concession that the Master Program update itself was legally mandated, and we disregard OSF's argument that the Master Program update needed justification.

1.      APPLICABLE LAW

The GMA governs the protection afforded to state shorelines.  RCW 36.70A.480.  CAOs adopted by local governments under the GMA apply to shorelines *until* the DOE approves a Master Program update, at which time the shorelines' critical areas are regulated exclusively under the SMA.  RCW 36.70A.480(3)(d); *Kitsap All. of Prop. Owners (KAPO) v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 160 Wn. App. 250, 257, 255 P.3d 696 (2011).

The Master Program guidelines thus note that "[f]or the purposes of completeness and consistency," local governments may include other locally adopted policies and regulations including CAOs into Master Programs.  WAC 173-26-191(2)(b).  This incorporation is allowed as long as the incorporated provisions meet SMA requirements.  RCW 36.70A.480(4).  Among those is the requirement of RCW 36.70A.480(4) that Master Programs "provide a level of protection to critical areas located within shorelines of the state that assures no net loss of shoreline ecological functions necessary to sustain shoreline natural resources as defined by [the DOE] guidelines."  In other words, the incorporated CAO provision must be consistent with RCW 90.58.020 and applicable Master Program guidelines, achieve no net loss, and provide a level of critical areas protection at least equal to that provided by the local government's CAOs.  RCW 90.58.090(4).

2.      BOARD DECISION

The Board concluded that the DOE's review assured that the incorporated CAO met the "'no net loss of ecological functions'" requirement for Master Programs prescribed in the GMA and as referenced in RCW 36.70A.480(4).  AR at 7500.  Thus, the Board concluded that OSF had not met its burden to establish that the County failed to meet the SMA or Master Program guideline requirements for the incorporation of the County's CAO into the Master Program.

14

3.    ANALYSIS

Here, the GMA and Master Program guidelines expressly provide that Master Programs may incorporate existing CAO provisions if they are consistent with the SMA and Master Program guideline requirements.  RCW 36.70A.480(4); WAC 173-26-191(2)(b).  OSF argues that the incorporation of the CAO into the Master Program "directly conflicts with the SMA" because the SMA allows for multiple uses of shorelines, but the critical areas designation prohibits reasonable and appropriate uses of the shoreline.  Br. of Appellant (OSF) at 27.

But OSF provides no factual support[11] for this assertion.  Further, OSF states that the Board did not cite to evidence showing that the DOE reviewed the CAO provisions for consistency with the SMA and Master Program guideline.  OSF also fails to provide legal authority that the Board must cite to such evidence, and OSF failed to provide any other analysis or factual support showing that the DOE failed to make the analysis OSF claims is needed.  We hold that OSF has failed to establish that the Board erred when it concluded that the Master Program's CAO incorporation did not violate the SMA or Master Program guidelines.

B.  ADOPTION OF 150-FOOT MARINE BUFFERS

Next, OSF argues that the Board erred when it upheld the Master Program's imposition of a 150-foot marine buffer on all shoreline development because the Master Program was not supported by proper evidence and violated the SMA and Master Program guidelines.  OSF's contentions are unavailing.

---

[11] The only factual citations in support of OSF's arguments about the CAO are to declarations that are not in our record and to its brief submitted to the Board characterizing the CAO.  These citations do not support OSF's argument.

No. 47641-0-II

1.    APPLICABLE LAW

When creating a Master Program, the DOE and the County are required to "[u]tilize a systematic interdisciplinary approach which will insure the integrated use of the natural and social sciences." RCW 90.58.100(1)(a). The Master Program guideline covering periodic review and amendments of Master Programs states that local governments should amend Master Programs when deemed necessary to reflect changing local circumstances, new information, or improved data. WAC 173-26-090. The GMA also addresses buffer regulations: "If a local jurisdiction's master program does not include land *necessary for buffers* for critical areas that occur within shorelines of the state, as authorized by RCW 90.58.030(2)(f), then the local jurisdiction shall continue to regulate those critical areas and their required buffers pursuant to RCW 36.70A.060(2)." RCW 36.70A.480(6) (emphasis added).

The Master Program guidelines also establish the type of scientific evaluation required for Master Programs:

> Before establishing specific master program provisions, local governments shall analyze the information gathered in (c) of this subsection and as necessary to ensure effective shoreline management provisions, address the topics below, where applicable.
>      (i) **Characterization of functions and ecosystem-wide processes.**
>      (A)   *Prepare a characterization of shoreline ecosystems and their associated ecological functions.* The characterization consists of *three steps:*
>      (I)   Identify the ecosystem-wide processes and ecological functions based on the list in (d)(i)(C) of this subsection that apply to the shoreline(s) of the jurisdiction.
>      (II)   Assess the ecosystem-wide processes to determine their relationship to ecological functions present within the jurisdiction and identify which ecological functions are healthy, which have been significantly altered and/or adversely impacted and which functions may have previously existed and are missing based on the values identified in (d)(i)(D) of this subsection; and
>      (III)   Identify specific measures necessary to protect and/or restore the ecological functions and ecosystem-wide processes.

16

WAC 173-26-201(3)(d) (emphasis added).

2.    BOARD DECISION

The Board devoted 10 pages of its decision to discussing the Master Program buffer imposition and the evidence supporting it. The Board analyzed the Master Program buffer guidelines and opined that the guidelines permitted local governments to provide land for buffers for critical areas. The Board further found the "[Master Program], the SI, and the CIA replete with scientific evidence demonstrating how the County met legal requirements to establish buffers and address vegetation conservation." AR at 7496. And the Board concluded that the County assembled scientific justification for the buffer width selected. The Board deemed OSF's arguments with respect to WAC 173-26-090 and -201 abandoned for lack of legal argument. The Board also acknowledged that RCW 36.70A.480 stated that a local government may include land necessary for buffers for critical areas, but the Board did not analyze whether the Master Program violated or complied with this statute.

3.    ANALYSIS

Here, the Master Program imposed a standard 150-foot buffer for all freshwater and marine water shorelines. JCC 18.25.270(4)(e). Challenging these provisions, OSF argues that the scientific information gathered in the SI and CIA are insufficient to justify the 150-foot buffers. OSF highlights some of the scientific resources the Master Program apparently relied on, but it does so largely without citation to the record. OSF makes many assertions about the insufficiency of the SI. OSF also states that the "Schaumburg Report" included in the supplemental evidence it

17

submitted on appeal undermines the science that the Master Program relies on.[12]  OSF's arguments

attack the adequacy of the selected buffer width.  The County's choice of 150 feet, however, is

supported by the scientific evidence summarized and discussed below and is consistent with the

policies of the SMA and the provisions of the SMA guidelines.

a.      SUFFICIENT EVIDENCE SUPPORTS THE MASTER PROGRAM'S BUFFER PROVISION

OSF fails to explain how the evidence supporting the buffer provision was insufficient or

how the conclusions in the Schaumburg Report undermine the Master Program's buffer provisions

such that they must be stricken and reevaluated.  When assessing the sufficiency of evidence, we

view the evidence in the light most favorable to the party who prevailed in the highest forum that

exercised fact-finding authority, here the Board.  *City of University Place v. McGuire*, 144 Wn.2d

640, 652, 30 P.3d 453 (2001).  Accordingly, based on the evidence below, we hold that the

scientific evidence is sufficient to support the buffer requirement.

i.      DOCUMENTED IMPACTS OF DEVELOPMENT AND SUPPORT FOR SHORELINE
BUFFERS

The SI documented the impacts of development on shorelines and provided support for the

buffer requirement.  The SI reports that potential and documented direct impacts from the

---

[12] The Schaumburg Report was written by an environmental consultant for OSF and asserts that the evidence relied upon from the CIA and SI does not include any research on the county marine environment or the efficacy of buffers in such environments.  The Schaumburg Report further concludes that the evidence relied on for the Master Program was mostly "[s]ynthesized science" or review summaries of existing scientific literature rather than original, applicable research.  Decl. of Kim Schaumburg Re Cited Scientific Literature in Support of Jefferson County Marine Buffers and Limits on Use, at 3 (included in (OSF's) Second Suppl. Evidence Submitted Re Constitutional Claims), *Olympic Stewardship Found. v. W. Wash. Growth Mgmt. Hr'gs Bd.*, No. 47641-0-II (Mar. 16, 2016).  And the Schaumburg Report states that the relevance of freshwater studies to marine environments was not properly established but, rather, presumed based on the recommendation of one scientific workshop.

development of piers, docks, and other shoreline modifications include loss of shoreline/riparian vegetation, burying of habitats, damage from equipment to eggs incubating on the beach, and lowering and coarsening of beach profiles. Indirect impacts can and have occurred from sediment transport and impoundment and from water quality degradation from development that affects forage fish and herring habitats. The SI further documented how development, near-shore armoring, and vegetation removal impacted ecological functions.

The SI contained support for the adoption of a 150-foot shoreline buffer[13] based on analysis of numerous factors including comparably sized buffers adopted by other Washington counties and the documented effect of different-sized buffers on various types of shoreline hazards.[14] The SI also states that "[d]epending on the specific nearshore resources being protected and the specific functions being provided by the buffer, recommended widths may differ." AR at 2446.

---

[13] A "buffer" refers to the horizontal distance that structures have to be set back, landward, from the shoreline high-water mark. A buffer area is required to be maintained in a vegetated, undisturbed, and undeveloped condition to protect shoreline functions and processes.

[14] The SI refers to a 2001 study of findings from the Canadian Ministry of Forestry in British Columbia recommending buffers of 300 to 450 feet for marine shores depending on the type of shore, wind conditions, and other factors. Other 2001 studies concluded that a 50-foot buffer is estimated to be approximately 60 percent effective at removing sediment, while an 82- to 300-foot buffer would remove approximately 80 percent of sediment, that a buffer as small as 27 feet could reduce nitrogen by up to 60 percent and widths of up to 200 feet could reduce nitrogen by 80 percent, and that control of fecal coliform from agriculture or septic systems could be achieved with a 115-foot buffer. A 2003 study stated that although sediment carried into nearshore marine environments will seldom be of a magnitude to significantly compromise water clarity, the minimum recommended buffer width for sediment control and pollutant removal is 98 feet. A 2004 study showed a minimum buffer of 79 feet was needed to control agricultural runoff for 20 percent slopes with slight erosion, while a 160-foot buffer would be needed to control 30 percent slopes with severe erosion. Further, a 1997 study showed for Washington State that the average width reported to retain riparian function for wildlife habitat was 288 feet.

ii.    CUMULATIVE IMPACT ANALYSIS ON KNOWN AND POTENTIAL ECOLOGICAL HARM

The CIA provided information about known and potential ecological harm to shorelines resulting from construction and development. The CIA stated that "Jefferson County's shorelines are in relatively good condition ecologically compared to more developed areas of the Puget Sound basin." AR at 2361. The CIA commented on the Draft Master Program's limitations on development:

> Importantly, the [Master Program] expressly prohibits any use/development that would cause a net loss of ecological functions or processes. As a result, the County must deny shoreline use and development proposals *unless impacts are fully mitigated. Specific performance standards contained in the [Draft Master Program] that will prevent cumulative impacts from occurring are summarized in this document*.

AR at 5650 (emphasis added). The CIA further stated, "The [Draft Master Program] imposes strict limits on construction of new bulkheads (or other types of structural shoreline stabilization or armoring) and expansion of existing bulkheads on residential properties to prevent adverse effects on net shore-drift, beach formation, juvenile salmon migratory habitat and other shoreline functions." AR at 2363. The CIA clarified that it evaluated the Draft Master Program to determine whether it contained adequate measures to mitigate use and development such that they would result in no net loss of ecological functions compared to baseline conditions. This evaluation presumed impacts will occur, but it evaluated whether there were adequate measures in place so post-development conditions are no worse overall than before development.

With respect to the Draft Master Program's water impact, the CIA noted that nutrients and matter entering marine waters via streams and rivers from agricultural operations, wastewater

treatment plants, and storm water runoff from residential landscapes affects the quality of the County's marine waters. The CIA addressed how buffers could help with this issue:

> Riparian buffers offer discernable water quality protection from nearshore nutrient sources. The effectiveness of riparian buffers for protecting water quality depends on a number of factors, including soil type, vegetation type, slope, annual rainfall, type and level of pollution, surrounding land uses, and sufficient buffer width and integrity. Soil stability and sediment control are directly related to the amount of impervious surface and vegetated cover.

AR at 5679.

The imposition of buffers protects shoreline ecological functions, processes, and habitat. The CIA also extensively discussed the buffers as part of the Master Program's no-net-loss compliance and what the impact of the buffer imposition would be on existing structures.

The Master Program's buffer requirement is amply supported by the scientific evidence.

b.   THE MASTER PROGRAM'S BUFFER PROVISION DOES NOT VIOLATE THE SMA OR MASTER PROGRAM GUIDELINES

OSF next asserts that under GMA provision RCW 36.70A.480(6) and Master Program guideline WAC 173-26-090, protection measures, like the buffers, that differ from an existing Master Program can be implemented only if the County proves such measures are necessary. We disagree.

RCW 36.70A.480(6) states that if a local Master Program does not include "land *necessary for buffers* for critical areas that occur within shorelines of the state," then local governments should continue to regulate critical areas and buffers pursuant to the GMA. (Emphasis added.) The Master Program guideline states that local governments should amend Master Programs when "*deemed necessary to reflect changing local circumstances, new information or improved data*." WAC 173-26-090 (emphasis added).

21

These provisions do not mean that a jurisdiction may impose or increase buffers only if necessary to serve a purpose of the SMA. The first provision, RCW 36.70A.480(6), merely specifies that if a Master Program does not include buffers necessary for critical areas, the jurisdiction shall continue to regulate those critical areas under the GMA. The second, WAC 173-26-090, describes when local governments should amend Master Programs in response to changing circumstances or information. Neither provision engraft a requirement of necessity on the adoption or amendment of Master Program provisions.

Additionally, OSF argues that the Board erred when it upheld the 150-foot buffer regulation where the County failed to establish a baseline of whether development proposals would impact ecological functions in order to determine if the 150-foot buffer was too extreme of a mitigation measure as required by Master Program guideline WAC 173-26-201(3)(d).[15] The Master Program guideline WAC 173-26-201(3)(d) requires that before local governments establish Master Programs, they must characterize the functions and ecosystem processes of the area regulated by (1) identifying ecosystem-wide ecological functions and processes, (2) assessing the processes to determine their relationship to the ecological functions in the jurisdiction to determine which functions are healthy, have been altered or adversely impacted, or are missing, and (3) identifying specific measures necessary to protect and/or restore ecological functions and ecosystem-wide processes.

The Board deemed OSF's arguments with respect to WAC 173-26-201 abandoned for lack of legal argument. The Board further found that the "[Master Program], the SI, and the CIA [were]

---

[15] OSF also cites to "WAC 173-26-201(2)(d)(A)(i)-(iii)" and "WAC 173-26-201(3)(d)(i)(v)." Br. of Appellant (OSF) at 33. But these rules as cited do not exist.

replete with scientific evidence demonstrating how the County met legal requirements to establish buffers and address vegetation conservation." AR at 7496. And here, OSF fails to explain why the evidence the Board deemed sufficient to meet the County's legal requirements is not sufficient under Master Program guideline WAC 173-26-201(3)(d). "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." *Holland*, 90 Wn. App. at 538; *see also* RAP 10.3(a)(6). We thus decline to consider this issue further in the absence of reasoned argument as to why the evidence is not legally sufficient under the relevant Master Program guideline. For these reasons, the Board did not err in upholding the Master Program's imposition of a 150-foot marine buffer.

### III. INCORPORATION OF "NO NET LOSS" INTO THE MASTER PROGRAM

OSF next argues that the Board erred when it upheld the Master Program "no-net-loss" requirement for permit applicants because that requirement conflicts with the SMA by improperly restricting development. OSF further argues that the SMA "minimization standard" must control instead, otherwise all new development will be prohibited. OSF's arguments do not persuade us.

### A. APPLICABLE LAW

The SMA's stated policy and use preference provision states, "[T]hat unrestricted construction on the privately owned or publicly owned shorelines of the state is not in the best public interest." RCW 90.58.020. Thus, the policy notes, "Permitted uses in the shorelines of the state shall be designed and conducted in a manner *to minimize, insofar as practical, any resultant damage to the ecology and environment of the shoreline area and any interference with the public's use of the water*." RCW 90.58.020 (emphasis added). The SMA states that amended Master Programs approved after September 2011 may include provisions authorizing changes in

23

"(b) . . . occupancy, or replacement of the residential structure if it is consistent with the master program, *including requirements for no net loss of shoreline ecological functions*."   RCW 90.58.620(1) (emphasis added).

In adopting the Master Program guidelines, the DOE adopted the phrase "no net loss of ecological functions" as a guiding principle for considering whether or not to approve local government programs.  WAC 173-26-186(8)(d).  In construing this principle, the Master Program guidelines acknowledge that any development has potential for "actual, short-term or long-term impacts" and that mitigation and other measures can assure the "end result will not diminish the shoreline resources and values as they currently exist."  WAC 173-26-201(2)(c).

The Master Program guidelines underscore the SMA policies and state,

> The principle regarding protecting shoreline ecological systems is accomplished by these guidelines in several ways, and in the context of related principles.  These include:
> . . . .
> (b)  Local master programs *shall* include policies and regulations *designed to achieve no net loss* of those ecological functions.
> (i)  Local master programs *shall include regulations and mitigation standards ensuring that each permitted development will not cause a net loss of ecological functions* of the shoreline; local government shall design and implement such regulations and mitigation standards in a manner consistent with all relevant constitutional and other legal limitations on the regulation of private property.

WAC 173-26-186(8) (emphasis added).  The Master Program guidelines state that the concept of "net"

> recognizes that any development has potential or actual, short-term or long-term impacts and that through application of appropriate development standards and employment of mitigation measures in accordance with the mitigation sequence, those impacts will be addressed in a manner necessary to assure that the end result will not diminish the shoreline resources and values as they currently exist.

WAC 173-26-201(2)(c).

24

B. BOARD DECISION

The Board concluded that the County correctly included the no-net-loss provision in the Master Program because the SMA clearly adopted the concept in RCW 90.58.620 and the Master Program guidelines require that no net loss be included in Master Programs. Thus, the Board concluded that OSF did not carry its burden to show that the Master Program's incorporation of the no-net-loss requirement violated the SMA.

C. ANALYSIS

OSF points to two Master Program provisions to argue that the Board erroneously approved the DOE's and the County's application of "no net loss." JCC 18.25.270(2)(b), .100(14)(e). The first provision covered critical areas, shoreline buffers, and ecological protections and states, "Uses and developments that cause a net loss of ecological functions and processes shall be prohibited. Any use or development that causes the future ecological condition to become worse than current condition shall be prohibited." JCC 18.25.270(2)(b). The second provision is the Master Program's definition of "no net loss" that states,

> "No net loss (NNL)" means the maintenance of the aggregate total of the county shoreline ecological functions over time. The no net loss standard contained in WAC 173-26-186 requires that the impacts of shoreline use and/or development, whether permitted or exempt from permit requirements, be identified and mitigated such that there are no resulting adverse impacts on ecological functions or processes.

JCC 18.25.100(14)(e). OSF argues that these provisions conflict with the policy of the SMA because the SMA no-net-loss policy is a concept gauged over time that recognizes that development will occur. It requires planning and mitigation measures, not prohibitions like those in the Master Program. This argument is unpersuasive.

As set out above, the Master Program guidelines state that Master Programs "shall include policies and regulations designed to achieve no net loss of those ecological functions" and "(i) . . . shall include regulations and mitigation standards ensuring that each permitted development will not cause a net loss of ecological functions of the shoreline." WAC 173-26-186(8)(b). By necessity, a proposal not complying with these mandatory directives would be prohibited. The denial of noncomplying proposals, however, is a common and effective feature of most regulatory systems. Nothing in the SMA suggests an intention to permit proposals that violate its terms. These mandatory directives from the Master Program that OSF challenges are consistent with the SMA policy set out in RCW 90.58.020, interpreted consistently with SEPA, as discussed above.

The County's Master Program complies with these standards through its policy to "[e]nsure, at minimum, no net loss of shoreline ecological functions and processes," JCC 18.25.010(1)(c), and through its mandate that "[u]ses and developments that cause a net loss of ecological functions and processes shall be prohibited." JCC 18.25.270(2)(b). The Master Program prohibitions do not go beyond the SMA or the guidelines, as OSF contends, because the very definition of "no net loss" in the Master Program incorporates the Master Program guideline definition of "no net loss" from WAC 173-26-186(8) and -201(2)(c). JCC 18.25.100(14)(e).

Additionally, the Master Program guideline definition of "net" *does not prohibit* development—the Master Program requires application of appropriate development standards and employment of mitigation measures in accordance with the mitigation to assure the development will not result in diminished shoreline resources and values as they exist before the development. WAC 173-26-186(8). We hold that the Master Program's no-net-loss provision does not conflict with the SMA or the Master Program guidelines.

26

No. 47641-0-II

IV. MASTER PROGRAM RESTORATION REQUIREMENTS

OSF next argues that the Board erred when it dismissed OSF's argument that the Master Program's permitting standards violated the law because they imposed restoration requirements that go beyond the SMA requirements to minimize impacts, that violate the SMA RCW 90.58.020 policy of protecting private property rights, and that unduly burden development rights in violation of Master Program guideline WAC 173-26-186. OSF argues that the Board's failure to address the specific SMA language that OSF cited to support its argument constitutes reversible error under RCW 34.05.570(3)(b), (d), and (f). Again, we disagree.

A. APPLICABLE LAW

The APA governs judicial review of agency orders in adjudicative proceedings.

> The court shall grant relief from an agency order in an adjudicative proceeding only if it determines that:
> . . . .
> (b) The order is outside the statutory authority or jurisdiction of the agency conferred by any provision of law;
> . . . .
> (d) The agency has erroneously interpreted or applied the law;
> . . . .
> (f) The agency has not decided all issues requiring resolution by the agency.

RCW 34.05.570(3).

The SMA policy and preferred use provision states that while coordinated planning is necessary to protect the public interest associated with state shorelines, the policy also recognizes and protects private property rights "consistent with the public interest." RCW 90.58.020. The Master Program guidelines require local governments to include restoration and shoreline enhancement goals in their Master Programs:

> For counties and cities containing any shorelines with impaired ecological functions, master programs *shall include* goals and policies *that provide for*

27

*restoration of such impaired ecological functions.* These master program provisions *shall identify* existing policies and programs *that contribute to planned restoration goals* and identify any additional policies and programs that local government will implement to achieve its goals.

WAC 173-26-186(8)(c) (emphasis added).

## B. BOARD DECISION

The Board concluded that OSF failed to establish that the Master Program provisions containing restoration requirements violated the law, including RCW 90.58.020 or WAC 173-26-186.

## C. ANALYSIS

OSF argues that the Board erred when it dismissed OSF's argument that the Master Program's permitting standards imposed restoration requirements that go beyond the SMA requirements to minimize impacts, that violate the SMA RCW 90.58.020 policy of protecting private property rights, and that unduly burden development rights in violation of Master Program guideline WAC 173-26-186. In its reply brief, OSF clarifies that its argument is that Master Program guideline WAC 173-26-186 directs *local governments* to make use of established nonregulatory policies and programs to contribute to restoration, but the Master Program goes beyond this requirement because it imposes restoration and shoreline enhancement requirements on *permit applicants.*

OSF does not support its first assertion that the Master Program restoration provisions go beyond the SMA requirements to minimize impacts. OSF neither points to any SMA mitigation provisions nor explains how the Master Program provisions go beyond them or why that would constitute error. Therefore, we hold that OSF's argument that the Board erred in this regard fails.

In support of OSF's arguments that the Master Program violated SMA policy provision RCW 90.58.020 and Master Program guideline WAC 173-26-186, OSF points specifically to the restoration requirements in the following four Master Program provisions.[16]

First,

> [t]o ensure that statewide interests are protected over local interests, the county shall review all development proposals within shorelines of statewide significance for consistency with RCW 90.58.030, this program, and the following, which are not listed in priority order:
>     (1) *When shoreline development or redevelopment occurs, it shall include restoration and/or enhancement of ecological conditions if such opportunities exist*.

JCC 18.25.250 (emphasis added).

Second, "*[w]henever possible*, nonregulatory methods to protect, enhance, *and restore* shoreline ecological functions should be encouraged for residential development." JCC 18.25.500(1)(j) (emphasis added). Third, "[s]ingle-user moorage for private/recreational float planes may be permitted as a conditional use where construction of such moorage . . . (iii) *Includes ecological restoration, in addition to mitigation, to compensate for the greater intensity of use associated with the float plane moorage*." JCC 18.25.350(6)(k) (emphasis added).

And fourth, "[m]arinas may be permitted on marine and river shorelines when they are consistent with this program and when the proponent demonstrates to the county's satisfaction that all of the following conditions are met: . . . (iii) The project *includes ecological restoration measures to improve baseline conditions over time*." JCC 18.25.350(7)(a) (emphasis added).

---

[16] The Board addressed none of these provisions. But neither the DOE nor the County argues that OSF failed to raise these provisions below, so we consider them. OSF's brief implies it raised the language of these provisions to the Board, but provides no cite to the record in support.

The first of these provisions requires that on SSWS, shoreline development or redevelopment "include restoration and/or enhancement of ecological conditions if such opportunities exist." JCC 18.25.250(1). The second provision applies to only residential development but extends to all shorelines. JCC 18.25.500(1)(j). It is an admonition, not a requirement, encouraging nonregulatory methods of restoration "[w]henever possible." JCC 18.25.500(1)(j). The third and fourth Master Program provisions cover boating facilities and marinas attached to residential development and plainly mandate restoration measures be included with development. JCC 18.25.350(6)(k)(iii), (7)(a)(iii).

But besides asserting in a conclusory manner that these provisions "go beyond" the SMA requirements to minimize impacts of development, OSF does not explain how requiring permit applicants to implement restoration measures is *error* requiring reversal of the Master Program or remand to strike these provisions of the Master Program. OSF provides no argument or analysis to show how these provisions violate private property rights in violation of RCW 90.58.020. And OSF provides no argument or analysis of how these provisions unduly burden development rights.

The challenged Master Program provisions comport with the SMA policy to coordinate development planning in order to protect public interest in shorelines and with the Master Program guidelines to include restoration goals and policies. RCW 90.58.020; WAC 173-26-186(8)(c). The applicable guideline, WAC 173-26-186(8)(c), states in pertinent part,

> For counties and cities containing any shorelines with impaired ecological functions, master programs shall include goals and policies that provide for restoration of such impaired ecological functions. These master program provisions shall identify existing policies and programs that contribute to planned restoration goals and identify any additional policies and programs that local government will implement to achieve its goals. These master program elements regarding restoration should make real and meaningful use of established or funded

nonregulatory policies and programs that contribute to restoration of ecological functions.

Although this guideline does not require that impaired ecological functions be restored as a condition of permit approval, nothing in it prevents a local government from imposing such a requirement. To the contrary, the restoration requirements in this Master Program, discussed above, are consistent with the directive of WAC 173-26-186(8)(c) that local governments adopt goals and policies for restoration of shorelines with impaired ecological functions. The Master Program's restoration requirements are also consistent with the core policy of the SMA "to protect the public interest associated with the shorelines of the state while, at the same time, recognizing and protecting private property rights consistent with the public interest." RCW 90.58.020. We hold that OSF fails to show that the Board erred by dismissing OSF's arguments related to the restoration provisions.

In conclusion, we reject OSF's arguments and affirm the Board's decision on these grounds. We now turn to CAPR's arguments.

PART TWO – CAPR APPEAL

CAPR also appeals from the Board's final decision and order that upheld the 2014 Master Program. CAPR argues that the Board erred by upholding the Master Program because (1) the Master Program delegated excessive discretion to regulators, rendering certain provisions unconstitutionally vague; (2) the Master Program failed to demonstrate sufficient evidence of harm to the shorelines, resulted in de facto prohibitions in violation of the SMA and permit applicants' due process rights, and imposed permit conditions that violated landowners' due process rights; and (3) the Master Program lacked support from scientific evidence and the DOE failed to identify the scientific sources relied upon. We reject these arguments.

31

ANALYSIS

I. VAGUENESS

CAPR argues that the language of certain Master Program provisions is unconstitutionally vague because it delegates excessive discretion to county employees who will enforce it.[17] CAPR argues that this argument is compounded by the Master Program's liberal construction provision. We disagree with both arguments.

A. STANDARD OF REVIEW AND APPLICABLE LAW

Constitutional issues are questions of law that we review de novo. *Ass'n of Wash. Spirits & Wine Distribs. v. Wash. State Liquor Control Bd.*, 182 Wn.2d 342, 350, 340 P.3d 849 (2015). The party challenging a statute's or regulation's constitutionality bears the burden of proving its unconstitutionality beyond a reasonable doubt. *Madison v. State*, 161 Wn.2d 85, 92, 163 P.3d 757 (2007). An ordinance or regulation is void for vagueness and violates constitutional due process if it is framed in terms so vague that persons of common intelligence must guess at the ordinance or regulation's meaning and differ as to its application. *Postema v. Pollution Control Hr'gs Bd.*, 142 Wn.2d 68, 114, 11 P.3d 726 (2000).

B. BOARD DECISION

The Board concluded that it had no jurisdiction to consider constitutional issues.

---

[17] CAPR also argues that because the Master Program is vague, it violates RCW 90.58.020, .900, former RCW 90.58.030(3)(c) (2014), WAC 173-26-176, and -191, but provides no argument or analysis as to why the Master Program violates these provisions. We do not consider claims unsupported by legal analysis. RAP 10.3(a)(6); *Cowiche Canyon*, 118 Wn.2d at 809.

C. ANALYSIS

First, CAPR argues that the Master Program's liberal construction provision[18] "compound[s]" the "lack of clarity" in the Master Program. Br. of Appellant (CAPR) at 27. And CAPR argues that the SMA, not a Master Program, is exempt from strict construction. This liberal construction provision, however, merely specifies that the Master Program shall be interpreted consistently with its policies and purposes and with those of the SMA. If anything, this direction adds to the clarity of the Master Program. It does not contribute to any vagueness.

Second, CAPR argues that several Master Program provisions state that those seeking permits on private property are "encouraged" to offer public access as part of the development.[19] And CAPR argues that this "loose" language will lead to coercive negotiation between developers and regulators. This argument is speculative and lacks factual support. CAPR fails to explain or argue *how* the language is vague and fails to offer legal argument as to how the language violates the law.

---

[18] The Master Program liberal construction provision states,

> This program is exempt from the rule of strict construction; therefore this program shall be liberally construed to give full effect to its goals, policies and regulations. Liberal construction means that the interpretation of this document shall not only be based on the actual words and phrases used in it, but also by taking its deemed or stated purpose into account. Liberal construction means an interpretation that tends to effectuate the spirit and purpose of the writing. For purposes of this program, liberal construction means that the administrator shall interpret the regulatory language of this program in relation to the broad policy statement of RCW 90.58.020, and make determinations which are in keeping with those policies as enacted by the Washington State Legislature. [Ord. 7-13 Exh. A (Art. I § 8)].

JCC 18.25.080.

[19] *See* JCC 18.25.290(1)(e), .450(1)(e), (6)(b), .470(1)(d), .500(4)(e), (f), (h).

Third, CAPR argues that the Master Program goal provision addressing global climate change and sea level rise[20] is vague such that it is arbitrary and capricious and improperly gives regulators the power to impute requirements on permit applicants based on regulators' personal preferences.[21] But this Master Program provision is contained in the Master Program "goals" section for shoreline use. *See* JCC 18.25.180(2). And the Master Program guidelines state that SMA's policy goals may not be achievable and that such policy goals should be pursued only via development regulations where such regulations do not unconstitutionally infringe upon private property rights. WAC 173-26-186(5).

CAPR challenges the constitutionality of the Master Program provisions it points to here and thus bears the heavy burden to prove unconstitutionality beyond a reasonable doubt. *Madison*, 161 Wn.2d at 92. For the above reasons, we hold that this goal provision is not vague. We hold also that CAPR's mere assertions that the Master Program will be administered arbitrarily or capriciously are speculative and do not meet CAPR's burden of proof to establish that the Master Program is unconstitutionally vague.

## II. LACK OF IDENTIFIED HARM, DE FACTO PROHIBITIONS, AND LAND OWNERSHIP DUE PROCESS VIOLATIONS

CAPR argues that the Board erred in upholding the Master Program because the County and the DOE (1) failed to demonstrate sufficient evidence of harm to the shorelines, (2) imposed

---

[20] *See* JCC 18.25.180(2)(j).

[21] CAPR also cites to Master Program provision JCC 18.25.300(1)(b), which states that "[p]roponents of a development on no-bank or low bank marine shorelines are encouraged to locate the bottom of a structure's foundation higher than the level of expected future sea-level rise." But CAPR provides no legal analysis of why this language is unconstitutionally vague.

34

de facto prohibitions on common developments, and (3) imposed permit conditions that violate land owners' due process rights. CAPR's contentions are unavailing.

### A. SUFFICIENT EVIDENCE OF IDENTIFIED HARM TO SHORELINES

CAPR argues that the Board erred in approving the Master Program because the County and the DOE failed to show evidence of actual, demonstrated harm to the shorelines from residential development, which is necessary to justify restricting citizens' private property rights. We disagree.

### 1. APPLICABLE LAW

As noted, Master Programs must comply with the provisions of the SMA, ch. 90.58 RCW, the policy of the SMA articulated in RCW 90.58.020, the Master Program guidelines codified in ch. 173-26 WAC, and certain other statutory provisions. RCW 90.58.190(2)(b). Master Programs are also subject to the grant of general police power of article XI, section 11 of the Washington Constitution. Section 11 states that "[a]ny county, city, town or township may make and enforce within its limits all such local police, sanitary and other regulations *as are not in conflict with general laws.*" (Emphasis added.) Regulations are consistent with article XI, section 11 unless "(1) the Ordinance conflicts with some general law; (2) the Ordinance is not a reasonable exercise of the County's police power; or (3) the subject matter of the Ordinance is not local." *Weden v. San Juan County*, 135 Wn.2d 678, 692-93, 958 P.2d 273 (1998). Stated another way, the regulation must tend to "'promote the health, safety, peace, education, or welfare of the people'" and must bear a reasonable relationship to accomplishing the purpose pursued. *Biggers v. City of Bainbridge Island*, 162 Wn.2d 683, 711, 169 P.3d 14 (2007) (Fairhurst, J., dissenting) (quoting *Weden*, 135 Wn.2d at 700).

These constitutional and statutory limitations do not require that local governments justify each Master Program provision by showing actual, demonstrated harm to the shorelines in the absence of the provisions. CAPR relies on the statement from *Biggers* that "[s]tanding alone, theoretical harm is not enough to deny private property owners fundamental access to the application review process or protection and use of their property." 162 Wn.2d at 687. This statement, though, was made in deciding a challenge to a series of rolling moratoria imposed by the City on certain shoreline development. The court held that those moratoria were not authorized by the SMA. *Biggers*, 162 Wn.2d at 697.

A requirement to show actual, demonstrated harm before *adoption* of a Master Program provision is not found in the SMA and would actively contradict SMA policies stated in RCW 90.58.020 and SEPA policies. RCW 43.21C.020; *Puget Soundkeeper All.*, 189 Wn. App. at 148. Such a requirement would also abandon the deferential test for exercises of the police power found in *Crane Towing, Inc. v. Gorton*, 89 Wn.2d 161, 168-69, 570 P.2d 428 (1977) (quoting *State v. Conifer Enters., Inc.*, 82 Wn.2d 94, 96-97, 508 P.2d 149 (1973)), which held that when analyzing an act of state police power, the court will place the burden of establishing invalidity on the party challenging legislation, and will presume that reasonably conceivable facts exist justifying the legislation, that the legislature passed the statute with reference to those facts, and that the statute is constitutional. For these reasons, *Biggers* must be confined to its narrow factual scope: the adoption of development moratoria. In adopting Master Program provisions, local governments are not required to demonstrate actual harm in their absence.

2.    BOARD DECISION

The Board stated that CAPR spent three pages of its brief addressing "what it states is a failure of the County to base its regulatory [Master Program] scheme on an adequate 'scientific base.'"  AR at 7531.  But the Board concluded that CAPR failed to actually name an SMA provision or Master Program guideline that requires a "scientific base" to be established, and therefore CAPR failed to show any provision or guideline was violated when such a scientific base was not established.  Elsewhere in the Board's decision, it also concluded that the SI was replete with scientific evidence showing that the County inventoried the shoreline and evaluated cumulative impacts from development.

3.    ANALYSIS

As shown above, the County is not required to show "actual, demonstrated" harm to the shorelines to justify the Master Program restrictions on landowners' use of their property.  Instead, Master Program restrictions must comply with the SMA, the Master Program guidelines, and certain other statutes, as well as meet the deferential reasonableness standard of article XI, section 11.

Here, CAPR failed to identify which Master Program provisions it claims improperly restrict landowners' rights.  But the record supports the Board's conclusion that the SI inventoried the conditions of the shoreline and the harm from development.  The SI contains a 121-page section describing conditions adjacent to individual shoreline segments including the armoring, marinas, beach access stairs, docks, and other structures for each shoreline reach.  The SI contains a 66-page overview of key species, habitats, and ecosystem evaluations of specific areas in the county shoreline.  The SI documents that the shoreline contains critical habitats and is home to numerous

threatened and endangered species, including declining salmonid species. The SI documents how development impacts ecological functions.

We view the evidence in the light most favorable to the respondents. *City of University Place*, 144 Wn.2d at 652. Here, there is sufficient evidence to persuade a fair-minded person that the Board's conclusion that the record contained sufficient evidence to justify the permit condition provisions in the Master Program based on identified harm is correct. We hold that CAPR's argument regarding the sufficiency of the evidence of harm to shorelines fails.

## B. No De Facto Prohibitions

CAPR argues that the Board erred when it upheld the Master Program because Master Program permit requirements result in de facto prohibitions[22] of common development actions including beach access structures, boating facilities, armoring, and developing in flood-prone areas. This argument is unpersuasive.

### 1. Applicable Law

The Master Program guidelines state that Master Programs shall include goals, policies, and actions for restoration of impaired shoreline ecological functions. WAC 173-26-201(2)(f). Master Programs shall also implement standards to ensure "[d]evelopment in flood plains should not significantly or cumulatively increase flood hazard." WAC 173-26-221(3)(c)(i). And new development or new uses in shoreline jurisdiction, including the subdivision of land, should not be established when it would be reasonably foreseeable that the development or use would require

---

[22] A "de facto prohibition" occurs when a land use is not expressly prohibited, but is prohibited in fact because restrictions render such use impractical. 83 AM. JUR. 2D *Zoning and Planning* § 132 (2017).

structural flood hazard reduction measures within the channel migration zone or floodway. WAC 173-26-221(3)(c)(i).

Single-family residences are a priority use under the SMA. WAC 173-27-241(3)(j). But a Master Program may still restrict or limit residential development. *Buechel*, 125 Wn.2d at 209. The SMA and the Master Program guidelines endorse, and in some instances require, the use of conditional use permits. RCW 90.58.100(5); WAC 173-26-191(2)(a)(iii)(B). The Master Program guidelines further state that the conditional use permit process is a method used to ensure uncommon impacts do not result in net loss. WAC 173-26-201(3)(d)(iii).

### 2.    BOARD DECISION

The Board found that CAPR failed to meet its burden of proof to establish that any of the Master Program provisions at issue resulted in de facto prohibitions of the uses in violation of the SMA or Master Program guidelines.

### 3.    ANALYSIS

First, CAPR cites to Master Program provisions related to the permit requirements for building beach access structures, boating facilities, and beach armoring.[23] And CAPR asserts that the public access and conditional use permit requirements included within these provisions will render a "de facto" prohibition on these types of development. CAPR offers legal citation for the propositions that the right to exclude others is an important property right and that access to the waterfront often lends property great value. And CAPR makes various further assertions including that these provisions are unfair, facially unconstitutional, and impossible to comply with and favor subjective standards. But CAPR fails to provide legal analysis or factual support for these

---

[23] JCC 18.25.340, .290, .100(3)(q), .590(1), .330 to .410.

assertions or for the proposition that these provisions result in "de facto prohibition" of the types of development they govern.

The record shows that the developments that CAPR claims are "de facto prohibited" are actually *allowed*. And these developments are allowed with some restrictions in certain areas that CAPR fails to establish are improper restrictions under the SMA and Master Program guidelines. Beach access structures, like stairs, are not prohibited: they are allowed in conservancy, residential, and high-intensity environments with a conditional use permit. And although CAPR correctly asserts that single-family residences are a priority use under the SMA, a Master Program may still restrict or limit residential accessory development. RCW 90.58.030(3)(e)(vi); *Buechel*, 125 Wn.2d at 209.

The Master Program also allows boat launches in all environments except priority aquatic areas and allows boat launches in natural and conservancy areas with a conditional use permit. Piers, docks, and floats are allowed everywhere except priority aquatic and natural environment areas and are allowed in conservancy environments with a conditional use permit. And armoring is prohibited in only natural environments. Besides arguing that these requirements will be "virtually impossible" to comply with, CAPR does not offer legal analysis or factual support to show boating facilities or armoring are de facto prohibited or that the restrictions placed on their development violate the SMA or Master Program guidelines.

Finally, CAPR cites to a Master Program goal provision related to flood control and asserts it is part of a "regulatory maze" at odds with the SMA and Master Program guidelines. Br. of Appellant (CAPR) at 40. But the Master Program provision at issue, JCC 18.25.380(1)(a), simply states that "[t]he county should prevent the need for flood control works by limiting new

development in flood-prone areas." This provision comports with the Master Program guideline mandating that Master Programs shall implement standards to ensure "[d]evelopment in flood plains should not significantly or cumulatively increase flood hazard" and shall restrict development or new uses if it is reasonably foreseeable that such development would require structural flood hazard reduction measures within the channel migration zone or floodway. WAC 173-26-221(3)(c)(i). We acknowledge that conditional use permits may burden some property owners, but we hold that CAPR fails to show that use of permitting processes and the other challenged provisions result in de facto prohibitions.

C. PERMIT PROVISIONS DO NOT VIOLATE DUE PROCESS RIGHTS

Relying on *Presbytery of Seattle v. King County*, 114 Wn.2d 320, 329-30, 787 P.2d 907 (1990), CAPR argues that the Master Program 150-foot buffer and permit provisions violate applicants' substantive due process rights. We disagree.

The parties dispute whether the *Presbytery* substantive due process test applies to facial challenges such as the one before us. We need not reach that issue because the Supreme Court's decision in *Amunrud v. Board of Appeals*, 158 Wn.2d 208, 143 P.3d 571 (2006), makes clear that the test in *Presbytery* does not apply to this appeal, whether its challenge is characterized as facial or as applied.

Decisions such as *Presbytery* and *Guimont v. Clarke* followed a three-part test under which courts examined "'(1) whether the regulation is aimed at achieving a legitimate public purpose; (2) whether it uses means that are reasonably necessary to achieve that purpose; and (3) whether it is unduly oppressive on the landowner.'" 121 Wn.2d 586, 609, 854 P.2d 1 (1993) (quoting *Presbytery*, 114 Wn.2d at 330).

In *Amunrud*, however, our Supreme Court severely limited the application of the third prong of that test. First, the court held that if a state action does not affect a fundamental right, the proper standard of review is a rational basis test, under which a challenged law must be rationally related to a legitimate state interest. *Amunrud*, 158 Wn.2d at 222. Second, the court assumed that any necessary state of facts that it could reasonably conceive of existed when it determined whether a rational relationship existed between the challenged law and a legitimate state interest. *Amunrud*, 158 Wn.2d at 222. And finally, the *Amunrud* court concluded that the court must apply only this rational basis test, so it need not also evaluate whether the challenged law is unduly oppressive on individuals. 158 Wn.2d at 226. Thus, the "unduly oppressive" element need not be evaluated where a recognized fundamental interest is not implicated.

Turning to what counts as a fundamental interest, *Amunrud* cited to the United States Supreme Court's recognition of "certain liberty interests protected by the due process clause but not explicitly enumerated in the Bill of Rights" and specified also that the right to pursue a particular profession is not a fundamental right. 158 Wn.2d at 220. None of these liberty interests are at stake in the present appeal.[24]

More to the point, we are aware of no case law holding that property owners have a fundamental right to do what they wish on their property without being troubled by reasonable regulation. Such a rule would contradict the broad and ample scope of the police power long

---

[24] In its regulatory takings cases, the Supreme Court has recognized a number of "fundamental attributes of ownership" including the right to possess, to exclude others, and to dispose of property. *Presbytery*, 114 Wn.2d at 329-30. The Supreme Court has also recognized the right to make some economically beneficial or productive use of land. *Guimont*, 121 Wn.2d at 599. Because petitioners do not argue that the presence of these interests triggers the "unduly oppressive" inquiry, we do not reach it.

recognized under state and federal law. *See, e.g.*, *W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 390, 57 S. Ct. 578, 81 L. Ed. 703 (1937); *Weden*, 135 Wn.2d at 692-93. Just as the right to pursue a particular profession is not a fundamental right but is a right which is nevertheless subject to reasonable government regulation, *Amunrud*, 158 Wn.2d at 220, so, for substantive due process purposes, is the right to use one's property.

The challenged Master Program does not threaten the fundamental interests that trigger heightened scrutiny under *Amunrud*. Therefore, under that opinion, the "unduly oppressive" criterion from prior substantive due process case law does not apply. The challenged portions of the Master Program are rationally related to serving a legitimate state interest. Therefore, they do not offend the doctrine of substantive due process.

### III. EVIDENTIARY SUPPORT OF THE MASTER PROGRAM

CAPR argues that the Board erred when it upheld the Master Program because (1) the SI was insufficient, (2) the CIA was insufficient, (3) the DOE failed to identify the sources reviewed and relied upon to update the Master Program, and (4) the record has insufficient science to support the imposition of the Master Program buffer requirement.[25] We disagree with CAPR's contentions.

---

[25] CAPR asserts that both the SI and CIA were incomplete because they are based on only "photos and literature" and lack sufficient field verification of existing conditions. Br. of Appellant (CAPR) at 20. But as a general note, Master Program guideline WAC 173-26-201(2)(a) clarifies the nature of the scientific information that must be gathered and states that "[a]t a minimum, make use of and, where applicable, incorporate all available scientific information, *aerial photography*, inventory data, technical assistance materials, manuals and services from reliable sources of science." (Emphasis added.)

No. 47641-0-II

A. STANDARD OF REVIEW

We review an agency determination for substantial evidence by determining whether there is a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order. *Spokane County*, 176 Wn. App. at 565. In doing so, we view the evidence in the light most favorable to the respondents. *City of University Place*, 144 Wn.2d at 652.

B. VERIFICATION OF EXISTING CONDITIONS IN THE SI

CAPR argues that the Board erred when it concluded that the SI contained sufficient evidence to support the Master Program. Specifically, CAPR argues that the SI supporting the Master Program does not contain sufficient inventory of shoreline conditions and development or sufficient analysis of how those conditions relate to marine habitats to fulfill Master Program guideline WAC 173-26-201(3)(c) and thereby impermissibly places the burden on property owners to evaluate cumulative impact of development on the shoreline.[26] We disagree.

1. APPLICABLE LAW

Master Program guideline WAC 173-26-201(3)(c) requires that when local governments prepare a Master Program, they must inventory their shoreline conditions. The guideline states that local governments shall

> [g]ather and incorporate all pertinent and available information, existing inventory data and materials from state and federal agencies, individuals and nongovernmental entities with expertise, affected Indian tribes, watershed management planning, port districts and other appropriate sources.
>     . . . .

---

[26] CAPR also asserts that the County violated Master Program guidelines "WAC 173-26-171 to 251" but cites to and provides analysis related to only WAC 173-26-201(3)(c). Br. of Appellant (CAPR) at 20. "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." *Holland*, 90 Wn. App. at 538. Thus, we do not address this assertion.

> Local government shall, at a minimum, and to the extent such information is relevant and reasonably available, collect the following information:
> (i) Shoreline and adjacent land use patterns and transportation and utility facilities, including the extent of existing structures, impervious surfaces, vegetation and shoreline modifications in shoreline jurisdiction.

WAC 173-26-201(3)(c).

2.    BOARD DECISION

The Board concluded that the SI was replete with scientific evidence showing that the County inventoried the shoreline, evaluated cumulative impacts from development, and documented current conditions. The Board opined that nothing in the SMA or Master Program guidelines required field verification of existing conditions. The Board further noted that the SI contains an overview of the key species and habitats within the County, an inventory that covers each shoreline area or "reach" in the County, and maps showing the shoreline areas and detailing different characteristics of the shorelines.

3.    ANALYSIS

CAPR fails to show that the Board erred when it concluded that the SI contained sufficient evidence to support the Master Program. First, field verification of each shoreline area's condition is not required by Master Program guideline WAC 173-26-201(3)(c) or any other SMA rule or Master Program guideline.

Second, the record supports the Board's conclusion that the SI inventoried shoreline conditions and development impacts. Overall, the SI was based on over 200 sources, many of which focused on Western Washington and the Puget Sound and some discussed marine environments. Specifically looking at the SI's inventory of the County's shoreline, the SI contains a 66-page overview of key species, habitats, and ecosystem evaluations of specific areas in the

45

county shoreline. The SI contains a 121-page section describing conditions adjacent to individual shoreline segments including the armoring, marinas, beach access stairs, docks, and other structures for each shoreline reach. The SI contains a 33-page map folio detailing characteristics of the County's state shorelines.[27]

The SI documents that the County's shoreline contains critical habitats and is home to numerous threatened and endangered species, including declining salmonid species. And from that evaluation, the SI concluded that "virtually all of the County's nearshore marine environment supports or has potential to support highly valuable and ecologically sensitive resources." AR at 6273.

The SI also documents how development, near-shore armoring, and vegetation removal impact ecological functions. The watershed characterization and landscape analysis of East Jefferson County identified areas that are the most important to maintaining ecosystems, areas with human-caused alterations that degrade the ecosystems, and areas that are best suited for protection, development, and/or restoration.

Beyond citing to two portions of the SI's "Background and Limitations" section,[28] CAPR fails to analyze *how* the data contained in the SI is insufficient to fulfill the requirements of Master

---

[27] These maps detail marine and freshwater shoreline planning areas, stream flows for rivers and streams, soil types, channel migration zones and flood plains, areas designated as critical areas and critical shoreline habitats, and the locations of aquatic vegetation, shoreline use patterns, and shellfish harvesting areas.

[28] The SI's introductory section entitled "Background and Limitations" acknowledges that the SI is "not intended as a full evaluation of the effectiveness of the SMA or County's existing shoreline policies or regulations" and that the SI "did not include field verification of shoreline conditions." AR at 3464. The SI then states, "[C]onsiderable effort was put forth to ensure that the information presented is complete and accurate as of the date of publication." AR at 3464.

Program guideline WAC 173-26-201(3)(c). We must view the evidence relied on by the Board in the light most favorable to the respondents. *City of University Place*, 144 Wn.2d at 652; *Spokane County*, 176 Wn. App. at 565. In doing so, we hold that there is a sufficient quantity of evidence to persuade a fair-minded person of the correctness of the Board's order that the SI fulfilled the requirements of WAC 173-26-201(3)(c). Accordingly, we hold that the SI inventoried the shoreline and documented current conditions in accordance with WAC 173-26-201(3)(c).

C.  EXISTING SYSTEMS AND FUTURE DEVELOPMENT EVALUATION IN THE CIA

CAPR argues that the Board erred in upholding the Master Program because the CIA supporting the Master Program does not contain sufficient evidence to fulfill the requirements of Master Program guidelines WAC 173-26-186(8)(a) and (d), which require evaluation of the effectiveness of the past Master Program in light of reasonably foreseeable development. We disagree.

1.  APPLICABLE LAW

Master Program guideline WAC 173-26-186(8) addresses how local governments should address protection of shoreline ecological functions:

> It is recognized that shoreline ecological functions may be impaired not only by shoreline development subject to the substantial development permit requirement of the act but also by past actions, unregulated activities, and development that is exempt from the act's permit requirements. *The principle regarding protecting shoreline ecological systems is accomplished by these guidelines in several ways, and in the context of related principles. These include:*
> (a) Local government is guided in its review and amendment of local master programs so that it uses *a process that identifies, inventories, and ensures meaningful understanding of current and potential ecological functions provided by affected shorelines.*
> . . . .
> (d) Local master programs shall evaluate and consider cumulative impacts of reasonably foreseeable future development on shoreline ecological functions and other shoreline functions fostered by the policy goals of the act. To ensure no net

loss of ecological functions and protection of other shoreline functions and/or uses, master programs shall contain policies, programs, and regulations that address adverse cumulative impacts and fairly allocate the burden of addressing cumulative impacts among development opportunities. Evaluation of such cumulative impacts should consider:

(i)  Current circumstances affecting the shorelines and relevant natural processes;

(ii)  Reasonably foreseeable future development and use of the shoreline; and

*(iii)  Beneficial effects of any established regulatory programs under other local, state, and federal laws.*

(Emphasis added.)

2.    BOARD DECISION

The Board concluded that neither the SMA nor the Master Program guidelines, including WAC 173-26-186(8)(d), require analysis of how an existing regulatory scheme protects shorelines as compared to an amended Master Program. The Board concluded that the CIA identified, inventoried, and documented current and potential ecological functions provided by affected shorelines and proposed policies and regulations to achieve no net loss as required by WAC 173-26-186(8).

3.    ANALYSIS

CAPR fails to show that the Board erred when it concluded that the CIA contained sufficient evidence to support the Master Program. First, Master Program guideline WAC 173-26-186(8)(d) states that the County "*should*" consider the "(iii)  [b]eneficial effects of any established regulatory programs under other local, state, and federal laws." Thus, as the Board concluded, this Master Program guideline did not require a Master Program to contain analysis of how an existing regulatory scheme would protect shorelines as compared to an amended Master

Program. Rather, it encouraged counties to consider the benefits of established regulatory programs in general.

Second, the record supports the Board's conclusion that the CIA inventoried current and potential ecological functions of the county shoreline and the proposed policies and regulations. The CIA included comment on the Draft Master Program's limitations on development:

> Importantly, the [Master Program] expressly prohibits any use/development that would cause a net loss of ecological functions or processes. As a result, the County must deny shoreline use and development proposals *unless impacts are fully mitigated. Specific performance standards contained in the [Draft Master Program] that will prevent cumulative impacts from occurring are summarized in this document*.

AR at 5650 (emphasis added). The CIA further states that "[t]he [Draft Master Program] imposes strict limits on construction of new bulkheads (or other types of structural shoreline stabilization or armoring) and expansion of existing bulkheads on residential properties to prevent adverse effects on net shore-drift, beach formation, juvenile salmon migratory habitat and other shoreline functions." AR at 2363. The CIA clarifies that it evaluates the Master Program to determine whether it contains adequate measures to mitigate use and development such that they will not result in a net loss of ecological functions compared to baseline conditions. This evaluation presumes impacts will occur, but it evaluates whether there are adequate measures in place so post-development conditions are no worse overall than before development.

The CIA further noted that piers, docks, and other over-water structures can have adverse effects including changing wave patterns, currents' littoral drift, or movement of aquatic life. Shading from piers can also alter juvenile salmon migration behavior, result in increased predation and disrupt feeding areas, change marine vegetation, decrease survival due to dislocation of herring eggs spawned on pilings at high tide elevations, and reduce eel grass and kelp beds.

49

CAPR fails to analyze how the data contained in the CIA is insufficient to fulfill the requirements of Master Program guidelines WAC 173-26-186(8)(a) and (d). Again, we must view the evidence relied on by the Board in the light most favorable to the respondents. *City of University Place*, 144 Wn.2d at 652; *Spokane County*, 176 Wn. App. at 565. In doing so it appears there is a sufficient quantity of evidence to persuade a fair-minded person of the correctness of the Board's order that the CIA fulfilled the requirements of WAC 173-26-186(8)(a) and (d). Thus, we hold that the CIA sufficiently inventoried how the Master Program would impact ecological functions in accordance with WAC 173-26-186(8)(a) and (d).

### D. SOURCES RELIED ON BY THE DOE FOR MASTER PROGRAM UPDATE

CAPR argues that the Board erred when it upheld the Master Program because the DOE failed to identify the information it reviewed and relied on when approving the updated Master Program in violation of RCW 34.05.272(2)(a).[29] CAPR fails to show that we can address this issue and also fails to support this argument.

As a threshold matter, CAPR fails to show how this issue is properly before us. CAPR provides no citation to the record that they argued before the Board that the DOE violated RCW 34.05.272(2)(a), and the Board did not address whether CAPR showed a violation of RCW 34.05.272(2)(a). Thus, because we review issues only raised before the Board, we hold that this issue is beyond the scope of this appeal.

---

[29] "Before taking a significant agency action, the [DOE] must identify the sources of information reviewed and relied upon by the agency in the course of preparing to take significant agency action," and the DOE must place an index of the records relied upon on their web site. RCW 34.05.272(2)(a).

Additionally, even if we hold that the issue was properly before us, this argument still fails for lack of legal analysis. Besides asserting that the DOE's approval of the Master Program violates RCW 34.05.272(2)(a), CAPR offers *no* legal analysis to demonstrate such violation. We do not consider claims unsupported by legal analysis. RAP 10.3(a)(6); *Cowiche Canyon*, 118 Wn.2d at 809. Thus, even if this argument was properly before us, we do not consider this issue because CAPR fails to support it.

E. SUFFICIENCY OF EVIDENCE SUPPORTING THE MASTER PROGRAM BUFFER PROVISION

CAPR argues that the Board erred when it upheld the Master Program 150-foot buffer provision because there was insufficient scientific evidence to support this provision as required by the SMA provisions RCW 90.58.100(1)(a) and (d).[30] CAPR's contentions are unavailing.

1. STANDARD OF REVIEW AND APPLICABLE LAW

We review this challenge for substantial evidence. *Spokane County*, 176 Wn. App. at 565. The SMA requires that "to the extent feasible," the DOE should "(a) [u]tilize a systematic interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts." RCW 90.58.100(1). And "to the extent feasible," the DOE should "(d) [c]onduct or support such further research, studies, surveys, and interviews as are deemed necessary." RCW 90.58.100(1).

2. BOARD DECISION

The Board concluded that counter to CAPR's assertion that there is no scientific justification in the record for the 150-foot buffer, the SI includes "summary references to numerous

---

[30] CAPR cites to RCW 90.*59*.100(1)(a) and (d), but we assume they mean chapter 90.58 RCW.

scientific studies which address varying buffer width recommendations." AR at 7521. The Board noted that these studies covered the effectiveness of various buffer widths to protect water quality, wildlife habitats, and travel corridors. The studies further recommended buffers consisting of ranges. The Board concluded that the County was required to adopt a Master Program to ensure no net loss, and in doing so, the County assembled "a considerable amount of scientific information, including information related to buffer widths." AR at 7522. The Board further concluded that the County had the latitude to adopt a buffer width within the range of widths from the assembled scientific information. Thus, the Board found that CAPR failed to meet its burden to show a violation of RCW 90.58.100(a) and (d).

3.    ANALYSIS

CAPR fails to show that the Board erred when it found that the record contained sufficient evidence to support the 150-foot buffer provision. The record supports the Board's finding. The SI referenced many scientific studies analyzing the effect of different sized buffers on various types of shoreline hazards.[31] The 150-foot shoreline buffer fell within the range of the buffer widths discussed in these studies.

In addition, the SI and CIA documented the ecological harms that buffers, in general, could help reduce or prevent. A 2004 report relied on by the SI documented pollution from toxic

---

[31] The SI refers to a 2001 study of findings from the Canadian Ministry of Forestry in British Columbia recommending buffers of 300 to 450 feet. Other 2001 studies concluded that an 82- to 300-foot buffer would remove approximately 80 percent of sediment. A 2003 study stated that the minimum recommended buffer width for sediment control and pollutant removal is 98 feet. A 2004 study showed a minimum buffer of 79 feet was needed to control agricultural runoff for 20 percent slopes with slight erosion, while a 160-foot buffer would be needed to control 30 percent slopes with severe erosion. Further, a 1997 study showed for Washington State the average width reported to retain riparian function for wildlife habitat was 288 feet.

substances, run off from rainwater, loss of habitat, and declines in key parts of the food web ecology in many areas of the Puget Sound. The CIA states that nutrients and matter entering via streams and rivers from agricultural operations, wastewater treatment plants, and storm water runoff from residential landscapes harms the quality of the County's marine waters. And the CIA addresses how buffers can help with this issue:

> Riparian buffers offer discernable water quality protection from nearshore nutrient sources. The effectiveness of riparian buffers for protecting water quality depends on a number of factors, including soil type, vegetation type, slope, annual rainfall, type and level of pollution, surrounding land uses, and sufficient buffer width and integrity. Soil stability and sediment control are directly related to the amount of impervious surface and vegetated cover.

AR at 5679.

The CIA documented that the imposition of buffers protects shoreline ecological functions, processes, and habitat. The CIA also contains extensive discussion of the buffers as part of the Master Program's no-net-loss compliance and what the impact of the imposition of the buffers would be on existing structures.

Viewing the evidence relied on by the Board in the light most favorable to the respondents, there is a sufficient quantity of evidence to persuade a fair-minded person of the correctness of the Board's order that the 150-foot buffer provision was supported by sufficient evidence to comply with RCW 90.58.100(1)(a) and (d). *City of University Place*, 144 Wn.2d at 652; *Spokane County*, 176 Wn. App. at 565. Additionally, CAPR does not refute the Board's finding that the County had the latitude to adopt a buffer width within the range of widths from the assembled scientific

information with any legal support.[32]  We hold that the evidence supporting the buffer provision was sufficient to meet the requirements of RCW 90.58.100(1)(a) and (d).

In conclusion, we reject CAPR's arguments and affirm the Board's decision on these grounds.  We now address S&G's arguments.

PART THREE – S&G APPEAL

S&G appeals the Board's final decision and order.[33]  S&G claims error regarding the prohibition of mining in conservancy-designated environmental areas.  S&G argues that the Board erred by upholding the mining limitation because (1) it violates the SMA and Master Program guidelines, (2) it was not supported by sufficient scientific evidence, and (3) the County failed to offer the public sufficient opportunity to comment.  Disagreeing with S&G's contentions, we affirm the Board's decision to uphold the Master Program provision prohibiting mining in conservancy-designated areas.

I. HOOD CANAL MINERAL RESOURCE LAND OVERLAY DESIGNATION

In 2004, the County adopted an ordinance creating a 690-acre "Mineral Resource Land Overlay" (Overlay) designation on lands in unincorporated Jefferson County west of Hood Canal.

---

[32] In its reply brief, CAPR asserts that the DOE's scientific data was insufficient to impose the 150-foot buffers and that the DOE disregarded data showing shoreline development would not have ecological impacts justifying the 150-foot buffers.  Because CAPR fails to include legal analysis to support this argument, we do not consider it.  RAP 10.3(a)(6); *Cowiche Canyon*, 118 Wn.2d at 809.

[33] S&G includes the appropriate standards of review in its briefing, but in its analysis it fails to apply any standard of review.  The County and the DOE also fail to apply any standard of review when addressing S&G's arguments.

Jefferson County Ordinance (JCO) 08-0706-04.[34]   The Overlay designates the property as

"Mineral resource lands," "land primarily devoted to the extraction of minerals or lands that have

a known or potential long-term commercial significance for the extraction of minerals."   JCC

18.10.130(M).

S&G mines sand and gravel (aggregate) from its property within the Overlay and transports

the aggregate from where it is mined to a "Shine Hub" where the aggregate is trucked to markets.

JCO 08-0706-04, at 17.  The Shine Hub is also located within Overlay-designated land.  JCO 08-

0706-04, at 9.  But S&G also owns additional property that is located outside the Overlay; this

shoreline property is zoned as rural residential.  JCO 08-0706-04, at 22 ("the land within the newly

designated [Overlay] is not within any Shoreline designation"); Figure 3-5, Suppl. Impact

Statement (SEIS), Overlay, S&G parcel report and map.[35]

In 2004, when the County approved the Overlay, it made several relevant findings related

to S&G's then-existing mining operations and its proposed future marine transport of aggregate

from a marine transport pier to be located on its shoreline property (pit-to-pier project).  The

County found that installation of the marine transport pier would increase S&G's mining and allow

it to sell the aggregate in more distant markets in a way it could never competitively do using only

---

[34] S&G cited to JCO 008-40706, but there appears to be no such ordinance.  A copy of the 2004 Overlay ordinance can be found attached to the County's response brief as an appendix and is available at http://test.co.jefferson.wa.us/weblinkexternal/O/doc/318714/Page1.aspx.

[35] A copy of figure 3-5 is attached as appendix 1 to Hood Canal Coalition's (Coalition) brief and was published as part of the SEIS for the Overlay.  S&G's parcel report and map from the Jefferson County assessor's office is attached as appendix 2 to the Coalition's brief and are available at http://www.co.jefferson.wa.us/assessors/parcel/parcelprint.asp?value=721194002   and   http://maps.co.jefferson.wa.us/website/mspub/viewer.htm?mapset=parcels&values=721194002.

trucks, because truck transport is too costly to the end user. JCO 08-0706-04, at 18. The County also found that truck transport and the proposed marine transport are independent methods because they would serve different markets. JCO 08-0706-04, at 18.

The Overlay ordinance further clarified that marine transport from the pit-to-pier project would not entirely replace truck traffic to get the aggregate to market. JCO 08-0706-04, at 18. Rather, projections were that aggregate transfer by truck from S&G's mine would increase by 50 percent in the next decades whether or not the pit-to-pier project was approved. JCO 08-0706-04, at 18. None of the County's Overlay findings stated that allowing marine transport from the Hood Canal shoreline was essential to or intrinsic to allow mining within the Overlay-designated land.

## II. MASTER PROGRAM REVIEW AND APPROVAL PROCESS

During two open comment periods spanning over two-and-a-half months, the County received approximately 600 comments. The July 2009 Draft Master Program included a mining regulation in conservancy-designated areas, which stated, "Conservancy: Mineral extraction and processing use and development may be allowed as a conditional use subject to the policies and regulations of this Master Program." AR at 2271. An open comment period on this draft occurred between August 19 and September 8, with a public hearing on September 8. Following receipt of these comments and several public hearings on the Master Program update, the Commissioners directed the DCD to incorporate changes based on the public comments.

In October 2009, the DCD staff released the Draft Master Program for the Commissioners' review. The Draft Master Program contained a revised mining limitation that stated, "Conservancy: Mining use and development *are prohibited*, except for transportation of minerals by road." AR at 2269 (emphasis added). In December, the Commissioners formally approved the

Draft Master Program. The land proposed for S&G's pit-to-pier project is among that classified as conservancy land.

In March 2010, the DCD sent the Draft Master Program to the DOE for review. From April to May, the DOE conducted a statewide public comment period on the Draft Master Program.

In January 2011, the DOE conditionally approved the Draft Master Program with some required and recommended changes along with findings of fact and conclusions of law to support its decision. From June 22 to July 25, the Commissioners had another open public comment period on the Draft Master Program. After further edits and communication with the DOE, in December 2013, the Commissioners approved and adopted the County's final Master Program.[36] In February 2014, the DOE approved the Master Program and it became effective. Ch. 18.25 JCC.

### III. MASTER PROGRAM MINING AND PIER PROVISIONS

The Master Program defines "mining" to include "[a]ll methods of transporting minerals to and from the mine," including marine transportation methods such as "conveyors, piers, and barges." JCC 18.25.100(13)(h)(i)(D). The Master Program prohibits mining within most shoreline environments, including the "conservancy" shoreline environment. JCC 18.25.480(3)(d).[37] The Master Program allows mining, including mine-related transportation,

---

[36] The Commissioners offered the final of six total public hearings during the Master Program update process on April 15, 2013, but this hearing was specifically to address provisions in the Master Program related to net pen fin fish aquaculture.

[37] "Conservancy. Mining use and development are prohibited, except for transportation of minerals by road." JCC 18.25.480(3)(d).

only in the "high intensity" shoreline environment. JCC 18.25.480(3)(f).[38] The Master Program also allows industrial and commercial piers in "[h]igh [i]ntensity" areas and in "[p]riority [a]quatic" and "[a]quatic" areas if the use is allowed in the upland shoreline environment. JCC 18.25.350(2)(f), (a), (b).

## IV. NO CONFLICT WITH THE SMA AND MASTER PROGRAM GUIDELINES

S&G argues that the Master Program's mining limitation conflicts with the SMA and Master Program guidelines. We disagree.

### A. BOARD DECISION

The Board noted that mining is not completely prohibited under the Master Program and that the Master Program allows mining in high-intensity designated areas. And the Board found that S&G failed to meet its burden to show that the Master Program violated the SMA or Master Program guidelines for prohibiting mining in some instances.

### B. SMA REQUIREMENTS

S&G argues that the Board erred when it rejected S&G's challenge that the Master Program's mining limitation violates SMA's enunciated policy provision contained in RCW 90.58.020 and an SMA provision contained in RCW 90.58.100(2)(a) ensuring that Master Programs incorporate economic development plans. These arguments are unpersuasive.

The SMA's policy provision states,

> The legislature declares that the interest of all of the people shall be paramount in the management of shorelines of statewide significance. The [DOE], in adopting guidelines for shorelines of statewide significance, and local government, in developing master programs for shorelines of statewide

---

[38] "High Intensity. Mining use and development may be allowed as a conditional use (CUP)." JCC 18.25.480(3)(f).

significance, *shall give preference to uses in the following order of preference which:*

> (1) Recognize and protect the statewide interest over local interest;
> (2) Preserve the natural character of the shoreline;
> (3) Result in long term over short term benefit;
> (4) Protect the resources and ecology of the shoreline;
> (5) Increase public access to publicly owned areas of the shorelines;
> (6) Increase recreational opportunities for the public in the shoreline;
> (7) Provide for any other element as defined in RCW 90.58.100 deemed appropriate or necessary.

RCW 90.58.020 (emphasis added).

And the provision further clarifies that

> [a]lterations of the natural condition of the shorelines of the state, *in those limited instances when authorized*, shall be given priority for single-family residences and their appurtenant structures, ports, shoreline recreational uses including but not limited to parks, marinas, piers, and other improvements facilitating public access to shorelines of the state, *industrial and commercial developments which are particularly dependent on their location* on or use of the shorelines of the state.

RCW 90.58.020 (emphasis added). The SMA also requires Master Programs to include an economic development element for the location and design of industries, port facilities, and other developments particularly dependent on their location or their use of the shoreline. RCW 90.58.100(2)(a).

Mining-related facilities like marine transport piers could be "industrial and commercial developments which are particularly dependent on their location on or use of the shorelines." RCW 90.58.020. But these SMA provisions that S&G relies on *do not* mandate that Master Programs must allow all industrial uses, like mining, in every shoreline environment. RCW 90.58.020, .100(2)(a). To the contrary, they anticipate Master Programs that allow, condition, or prohibit various uses in different shoreline environments in conformance with the order of preference in RCW 90.58.020, above.

In addition, SEPA requires that the laws of the State, including the SMA, be interpreted and administered in accordance with the policies of SEPA. RCW 43.21C.030. Among those policies is the recognition of "the responsibilities of each generation as trustee of the environment for succeeding generations," RCW 43.21C.020(2)(a), and the recognition that "each person has a fundamental and inalienable right to a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment." RCW 43.21C.020(3). *Accord Puget Soundkeeper All.*, 189 Wn. App. at 148. In *Lands Council v. Washington State Parks & Recreation Commission*, 176 Wn. App. 787, 808, 309 P.3d 734 (2013), we recognized this notion of trusteeship to be the "quickening principle" of SEPA. The County acted consistently with these principles and purposes.

S&G bears the burden of establishing the invalidity of the Master Program. *Quadrant Corp.*, 154 Wn.2d at 233. We hold that S&G fails to show that the Master Program mining limitation violates the SMA.

C. MASTER PROGRAM GUIDELINE REQUIREMENTS

S&G argues that the Board erred when it rejected S&G's challenge that the Master Program's mining limitation violated Master Program guidelines WAC 173-26-231(3)(b) and -201(2)(d). These arguments are unpersuasive.

WAC 173-26-231 contains the shoreline modifications guidelines for piers and docks. WAC 173-26-231(3)(b) states, "New piers and docks shall be allowed only for water-dependent uses or public access." These guidelines further clarify that Master Programs shall allow *only* "shoreline modifications that are appropriate to the specific type of shoreline and environmental conditions for which they are proposed." WAC 173-26-231(2)(c).

Master Program guideline WAC 173-26-201(2)(d) states that preference should be given to uses "*that are unique to or dependent upon a shoreline location.*" (Emphasis added.) But this guideline also states that "[s]horeline areas, being a limited ecological and economic resource, are the setting for competing uses and ecological protection and restoration activities." WAC 173-26-201(2)(d). And this guideline notes that for SSWSes, Master Programs should give priority and preference first to "(i) [r]eserve appropriate areas for protecting and restoring ecological functions to control pollution and prevent damage to the natural environment and public health" and second to "(ii) *[r]eserve shoreline areas for water-dependent*" uses like transportation uses. WAC 173-26-201(2)(d) (emphasis added).

S&G is correct that WAC 173-26-231(3)(b) allows for docks and piers to be built for water-dependent uses. But S&G ignores the fact that the same guideline clarifies that such modifications are allowed *contingent on the environmental designation* of the area where development is proposed, like the conservancy designation at issue here. WAC 173-26-231(2)(c). And contrary to S&G's argument, WAC 173-26-201(2)(d) does not state that development, including that needed for mining transport, must be allowed in every environmental area. Rather, this guideline is clear that Master Programs must recognize the competing needs for use, but that the first preference is given to environmental protection and restoration. WAC 173-26-201(2)(d). S&G bears the burden of establishing the invalidity of the Master Program. *Quadrant Corp.*, 154 Wn.2d at 233. We hold that S&G fails to show that the Master Program provision prohibiting mining in conservancy areas violates these Master Program guidelines.

## V. SCIENTIFIC SUPPORT OF THE MASTER PROGRAM

S&G next argues that the Board erred when, in violation of the SMA and Master Program guidelines, it upheld the Master Program provision "banning" mining in conservancy areas because there is insufficient scientific and technical analysis to support this limitation on mining.[39] We disagree.

### A. STANDARD OF REVIEW

As previously noted, we review an agency determination for substantial evidence by determining whether there is a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order. *Spokane County*, 176 Wn. App. at 565. In doing so, we view the evidence in the light most favorable to the respondents. *City of University Place*, 144 Wn.2d at 652.

### B. APPLICABLE LAW

The SMA states that "[i]n preparing the master programs, and any amendments thereto, the [DOE] and local governments *shall to the extent feasible*: (a) [u]tilize a systematic interdisciplinary approach which will insure the integrated use of natural and social sciences and the environmental design arts." RCW 90.58.100(1) (emphasis added).

---

[39] S&G includes a false premise within this argument that the Master Program renders an "outright ban on marine transport of aggregate." Br. of Appellant (S&G) at 29. The Master Program prohibits mining within most shoreline environments, including the "conservancy" shoreline environment. JCC 18.25.480(3)(d). But the Master Program allows mining, including mine-related transportation, in the "high-intensity" shoreline environment. JCC 18.25.480(3)(f). The Master Program also allows industrial and commercial piers in "[h]igh-[i]ntensity" areas and in "[p]riority aquatic" and "[a]quatic" areas if the use is allowed in the upland shoreline environment. JCC 18.25.350(2)(f), (a), (b).

Master Program guidelines state that local jurisdictions are to "identify and assemble the most current, accurate, and complete scientific and technical information *available* that is applicable to the issues of concern." WAC 173-26-201(2)(a) (emphasis added). Jurisdictions must also "base master program provisions on an analysis incorporating the most current, accurate, and complete scientific or technical information *available*." WAC 173-26-201(2)(a) (emphasis added).

## C. BOARD DECISION

The Board found that S&G failed to show insufficient evidence supported the Master Program such that it violates the SMA and Master Program guidelines.

## D. ANALYSIS

S&G argues that the Board erred when it upheld the Master Program because there is insufficient evidence to support the Master Program's mining limitation in violation of SMA provisions RCW 90.58.100(1) and WAC 173-26-201(2)(a).[40] This argument is unpersuasive.

---

[40] S&G also asserts that the mining limitation is not in line with the SMA policy provision RCW 90.58.020 and conflicts with the Master Program guideline WAC 173-26-201(2)(d), which sets out priority uses under the SMA. But S&G fails to offer any legal analysis showing how the Master Program conflicts with this SMA provision or this Master Program guideline. And as was discussed above, the SMA policy provision establishes a clear order of priority for use on the shoreline—but it does not include mining or mining-related activity like marine transport nor does it mandate that Master Programs allow all industrial uses in every environment. RCW 90.58.020. Master Program guideline WAC 173-26-201(2)(d) also does not state that development, including that needed for mining transport, must be allowed in every environmental area. Rather this guideline is clear that Master Programs must follow a process in which first preference is given to environmental protection and restoration. WAC 173-26-201(2)(d).

S&G fails to point to any evidence that the County failed to consider relevant evidence as required under RCW 90.58.100(1) and WAC 173-26-201(2)(a).[41] There is also scientific evidence in the record supporting the Board's conclusions.

The SI report and CIA demonstrate that the County inventoried and evaluated Hood Canal's shorelines and made the conservancy designation based on the scientific analysis available. The County documented that Hood Canal contains salmonid habitat, salt marshes, and lagoons, erosive and/or hazardous slopes, and commercial shellfish beds. And in the SI, the County designated the S&G shoreline property as a "conservancy" area based on its environmental attributes. These include: high-functioning shoreline resources with a low degree of modification or stressors, the presence of salmonid habitats, the presence of erosive or hazardous slopes, and the presence of commercial shellfish beds. Direct impacts from the development of piers, docks, and other shoreline modifications can include loss of shoreline/riparian vegetation, burying of habitats, damage from equipment to eggs incubating on the beach, and lowering and coarsening of beach profiles. Indirect impacts can occur from sediment transport and impoundment and water quality degradation from development that affect forage fish and herring's habitats.

The CIA stated that "the type and intensity of uses allowed in areas designated Natural and Conservancy are tightly controlled since these areas are the most sensitive to future development and the most vital to protect." AR at 5683. The CIA further noted that piers, docks, and other

---

[41] S&G cites to a letter to the DOE arguing that the prohibition of aquaculture was not properly supported by science as evidence of the "necessary procedures" the County and the DOE had to engage in "when it came to banning marine transportation of aggregate." Br. of Appellant (S&G) at 30. But this letter does not establish the rules the County and the DOE had to follow nor illustrate how the implementation of the Master Program with respect to mining violated these rules. We hold that S&G's argument based on this record cite fails.

over-water structures can have adverse effects including blocking or baffling wave patterns, currents, littoral drift, or movement of aquatic life. Shading from piers can also alter juvenile salmon migration behavior, result in increased predation, disrupt feeding areas, change marine vegetation, decrease survival due to dislocation of herring eggs spawned on pilings at high tide elevations, and reduce eel grass and kelp beds.

We must view the evidence relied on by the Board in the light most favorable to the respondents. *City of University Place*, 144 Wn.2d at 652. And in doing so, it appears there is a sufficient quantity of evidence to persuade a fair-minded person that the record supported that the Master Program mining limitation is in compliance with SMA provision RCW 90.58.100(1) and Master Program guideline WAC 173-26-201(2)(a). We hold that the Master Program was sufficiently supported by scientific evidence in accordance with RCW 90.58.100(1) and WAC 173-26-201(2)(a).

VI. PUBLIC COMMENT ON THE MINING LIMITATION

S&G argues that insertion of the mining limitation into the Master Program after public hearings and the opportunity for public comment on the Draft Master Program had closed violated the SMA, Master Program guidelines, and S&G's due process rights. We hold that S&G fails to show that the SMA, Master Program guidelines, and S&G's due process rights were violated.

A. PUBLIC COMMENT UNDER THE SMA AND MASTER PROGRAM GUIDELINES

1. STANDARD OF REVIEW

"Procedural errors, such as lack of proper notice, are questions of law reviewed de novo." *Cent. Puget Sound Reg'l Transit Auth. v. Miller*, 156 Wn.2d 403, 412, 128 P.3d 588 (2006). A

challenger of notice bears the burden of proof that the notice was defective.  *Cent. Puget Sound Reg'l Transit Auth.*, 156 Wn.2d at 412-13.

2.    APPLICABLE LAW

The SMA requires that the DOE and the County make reasonable efforts to inform and offer involvement opportunities to "all persons and entities having an interest in" the Master Program update.  RCW 90.58.130.  The Master Program guidelines state that in order to fulfill this duty, the DOE and the County shall establish and engage in "early and continuous" public participation procedures including "broad dissemination of informative materials, proposals and alternatives, opportunity for written comments, public meetings after effective notice, provision for open discussion, and consideration of and response to public comments."  WAC 173-26-090. "Local governments may modify the timing of the various steps, integrate the process into other planning activities, add steps to the process, or work jointly with other jurisdictions or regional efforts, provided the provisions of this chapter are met."  WAC 173-26-201(3)(a).

3.    ANALYSIS

S&G argues that the County "failed to provide any public participation whatsoever" on the mining limitation in the Draft Master Program and thereby violated SMA provision RCW 90.58.130 and Master Program guideline WAC 173-26-090.  Br. of Appellant (S&G) at 33.[42]  This argument is unpersuasive.

---

[42] S&G alleges that the County inserted the mining limitation the day it adopted the Master Program and neglected to notify the public of the mining limitation beforehand in any materials, Draft Master Programs, or hearings.  But S&G fails to support these assertions with *any* citation to the factual record.

S&G had the opportunity to comment on the Master Program provision regarding mining in the conservation area. The July 2009 draft of the Master Program contained a provision that allowed mining in the conservation area. And that draft was open to public comment from August 19 to September 8. S&G had the opportunity to comment on whether mining should be allowed in conservation areas. Master Program guidelines require the County to solicit public comment and hold at least one public hearing on a Draft Master Program before it goes to the DOE. WAC 173-26-100(1). The County did so here. S&G does not point to anything in the record showing that the Commissioners changed or intended to change their proposal on the mining provision in the Draft Master Program before the public comment period. Apparently, it was only after considering the public's comments that the Commissioners found that mining should be prohibited in conservation areas.[43]

The SMA and Master Program guidelines do not require that the County provide opportunity for public comment every time a part of a Draft Master Program is changed. In fact, if this requirement existed, a local government would be faced with the choice of conducting an indefinite string of hearings or never making changes in response to public comments.

And here, S&G fails to establish that the County violated the SMA or the Master Program guidelines when the Commissioners reviewed the comments submitted between August 19 and

---

[43] S&G also argues that the original version of the Master Program that went through an extensive, multi-year public process did not include the mining limitation. And S&G argues that the original Master Program without the mining limitation was recommended by the County's planning commission and staff. But besides citing to one Draft Master Program from 2009, S&G does not support these assertions with any citation to the factual record. But even if we assume this assertion is true, we hold that it does not establish that S&G was deprived of all opportunity to comment on this provision.

September 8 and exercised their discretion to adjust the Master Program. We note that the Master Program guidelines indicate that the County has some discretion during the Master Program modification process because "[l]ocal governments may modify the timing of the various steps, integrate the process into other planning activities, [and] add steps to the process." WAC 173-26-201(3)(a). Further, it seems apparent that S&G had to know that a proposal to allow mining in a conservancy area would spark opposition and that the Commissioners could be persuaded by that opposition.

We hold that in compliance with WAC 173-26-090, S&G was notified that the issue of whether to allow mining in the conservancy environment was before the Board. We further hold that S&G had an opportunity to comment about that issue before the Commissioners made changes to the Draft Master Plan. We reject S&G's argument and hold that the County followed the SMA and Master Program guidelines to ensure all persons had full opportunity to comment.

### B. DUE PROCESS RIGHTS

S&G argues that its procedural due process rights to notice and "to subsequently participate in the process" of adopting the mining limitation were also violated. Br. of Appellant (S&G) at 36. We reject this argument.

"Procedural errors, such as lack of proper notice, are questions of law reviewed de novo." *Cent. Puget Sound Reg'l Transit Auth.*, 156 Wn.2d at 412. The due process clause in the Fourteenth Amendment of the United States Constitution provides that no State shall deprive any person of life, liberty, or property without due process of law. U.S. CONST. amend. XIV, § 1.

Due process includes the requirement that notice must apprise interested citizens of the nature and purpose of the hearing so they can participate effectively. *Responsible Urban Growth*

*v. City of Kent*, 123 Wn.2d 376, 386, 868 P.2d 861 (1994). "If notice fails to apprise parties of the nature and purpose of proceedings the good intentions of officials in satisfying statutory requirements are irrelevant." *Responsible Urban Growth*, 123 Wn.2d at 386.

In support of its argument, S&G cites to *Harris v. County of Riverside*, 904 F.2d 497, 503 (9th Cir. 1990).[44] But *Harris* is distinguishable. Steven Harris bought a small piece of commercial land intending to use the property for an all-terrain vehicle rental facility. *Harris*, 904 F.2d at 498. The Riverside County Board of Supervisors published notice of a public hearing related on a general plan amendment that would encompass over a hundred square miles. *Harris*, 904 F.2d at 499. The enacted general plan redesignated Harris's property from land accommodating commercial uses to residential. *Harris*, 904 F.2d at 499. Harris did not receive notice of the change prior to its enactment. *Harris*, 904 F.2d at 499. The *Harris* court held that the redesignation deprived Harris of his land's commercial use, specifically targeted his property for a zoning change after notice had been published, and therefore deprived him of due process. 904 F.2d at 501-02, 504.

But as discussed above, S&G had the opportunity to comment on mining in the conservation areas when this provision was originally drafted. And absent any proof to the contrary, given that the original provision spoke to whether mining would be allowed in conservancy areas, S&G had notice this provision could be at issue. Thus, *Harris*, where no notice was given, is factually distinguishable.

---

[44] The Board did not review this issue because it found that it had no jurisdiction to consider constitutional issues.

*Harris* is also distinguishable because Harris's property was rezoned from commercial to residential and the court found his property was specifically targeted. 904 F.2d at 501-02. Here, S&G's property was not specifically targeted. The Master Program is a general shoreline plan that prohibits mining in all conservancy areas, not just on S&G's conservancy shoreline property.

Finally, although S&G argues that the mining limitation prevented S&G from utilizing marine transport of its aggregate, this is an exaggeration. Marine transport of aggregate is prohibited only in conservation areas, but is allowed in high-intensity areas. JCC 18.25.480(3)(f).

We affirm the Board's decision to uphold the Master Program provision prohibiting mining in conservancy-designated areas.

## CONCLUSION

The parties' challenges to the Board's decision, as addressed above, fail. Finding no error in the Board's decision, we affirm.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

## FURTHER DISCUSSION

## PART ONE - OSF APPEAL

In response to OSF's remaining arguments, we hold that the Board correctly upheld the natural shoreline designation and that OSF's constitutional challenge fails. We do not consider issues related to the Board's dismissal of some of OSF's arguments. And we deny OSF's request for appellate fees.

## I. NATURAL SHORELINE DESIGNATION

OSF briefly argues that the Board erred when it did not review or reverse the part of the Master Program that designated 41 percent of shorelines as "'[n]atural [s]horelines'" without authorization from the SMA or guidelines and without considering the actual conditions of the County. Br. of Appellant (OSF) at 39. We reject this argument.

### A. APPLICABLE LAW

The Master Program guidelines govern environmental designations and set out the following requirements for such designations in Master Programs:

> Master programs shall contain a system to classify shoreline areas into specific environment designations. This classification system shall be based on the existing use pattern, the biological and physical character of the shoreline, and the goals and aspirations of the community as expressed through comprehensive plans as well as the criteria in this section.

WAC 173-26-211(2)(a). The Master Program guidelines further require that environmental designations be consistent with the SMA, Master Program guidelines, and Master Programs. WAC 173-26-211(3). A shoreline area is designated as natural in order to "protect those shoreline areas that are relatively free of human influence or that include intact or minimally degraded shoreline functions intolerant of human use." WAC 173-26-211(5)(a)(i).

### B. BOARD DECISION

The Board found that OSF failed to provide legal argument demonstrating how the County violated criteria for designating areas of land in the SMA or Master Program guidelines or how the Master Program "'over-designated' natural areas." AR at 7503. The Board further found that the Master Program meets SMA guideline requirements, though it did not specify why it found so.

C. ANALYSIS

To support its argument that the Board should have reversed this "over-designation," OSF cites to Master Program guidelines WAC 173-26-211(2)(a) and (3) in a footnote.[45] But OSF does not offer any legal analysis as to why the Master Program's natural designation violated these provisions. OSF further argues that neither the Board nor respondents addressed the criteria for reclassifying rural residential-zoned properties as "natural shorelines" in violation of Master Program guidelines WAC 173-26-211(2)(a), (5)(a)(i) through (iii). But OSF fails to provide a record cite demonstrating that the areas the Master Program designated natural were previously rural residential areas, explain the significance of that change, or analyze how these Master Program guidelines show that the natural designation is improper.

Even so, the record supports the natural designation. Based on the SI, the County designated the county shorelines as natural if they had "minimal shoreline modification," "other high quality/pristine habitat characteristics," or "were important feeder bluffs or otherwise unsuitable for development." AR at 3686. This action comports with the Master Program guidelines for designating natural shorelines. WAC 173-26-211(5)(a)(i). The shoreline environmental designations were produced for public comment and were developed with extensive input from the Shoreline Technical Advisory Committee and Shoreline Policy Advisory Committee after review of the aerial photography of the marine shoreline. And the Master

---

[45] OSF provides no analysis explaining how the Board made a procedural error by its "refusal to review" the natural shoreline environmental designation. Br. of Appellant (OSF) at 40. We are not required to consider claims unsupported by legal authority or argument. RAP 10.3(a)(6); *Cowiche Canyon*, 118 Wn.2d at 809. Thus, we need not consider whether the Board made such a procedural error.

Program also allowed for residential development in the natural areas where the prior Master Program prohibited it. We hold that OSF's argument that the natural shoreline designation constituted error fails.

## II. DOCTRINE OF UNCONSTITUTIONAL CONDITIONS

OSF argues that the Board erred when it upheld the Master Program provisions that use the permit process to compel shoreline property owners to (1) set aside tracts of property for generic buffers and (2) dedicate public access easements because these provisions violate the doctrine of unconstitutional conditions. OSF states that its argument is a *facial* challenge that these Master Program provisions cannot meet the nexus and proportionality standards set forth in *Nollan v. California Coastal Commission*, 483 U.S. 825, 107 S. Ct. 3141, 97 L. Ed. 2d 677 (1987), *Dolan v. City of Tigard*, 512 U.S. 374, 114 S. Ct. 2309, 129 L. Ed. 2d 304 (1994), and *Koontz v. St. Johns River Water Management District*, ___ U.S. ___, 133 S. Ct. 2586, 2594, 186 L. Ed. 2d 697 (2013).[46]

OSF further argues that case law establishes that the Master Program buffer provision qualifies as an exaction subject to *Nollan* and *Dolan* because the Master Program buffer provision requires property owners to surrender a valuable real property interest. OSF argues that the fact that the Master Program buffer provision allows for minor variances does not remedy the fact that the Master Program does not meet nexus and proportionality tests. Finally, OSF argues that the *public trust doctrine* does not vest ownership of private land to the public such that the Master Program public access provisions are not in violation of the doctrine of unconstitutional conditions.

---

[46] OSF confirms in its reply brief that it does not raise an as-applied challenge.

We do not reach all of the arguments, but rather hold that OSF fails to establish that the *Nollan/Dolan* tests can be applied to a facial taking claim.

### A. BOARD DECISION

The Board concluded that it had no jurisdiction to consider constitutional issues.

### B. APPLICABLE LAW

Under the "'unconstitutional conditions'" doctrine, the government may not require a person to give up a constitutional right in exchange for a discretionary benefit. *Dolan*, 512 U.S. at 386. A plaintiff alleging a violation of the "unconstitutional conditions" doctrine, however, must first establish that a constitutional right is being infringed upon. *Guimont*, 121 Wn.2d at 595. Administrative regulations are presumed to be constitutional. *Bang D. Nguyen v. Dep't of Health, Med. Quality Assur. Comm'n*, 144 Wn.2d 516, 536, 29 P.3d 689 (2001). Thus, the party challenging a statute's or regulation's constitutionality bears the burden of proving its unconstitutionality beyond a reasonable doubt. *Madison*, 161 Wn.2d at 92.

*Nollan*, *Dolan*, and *Koontz* all involve a special application of the "unconstitutional conditions" doctrine protecting federal Fifth Amendment rights to just compensation *for property the government takes* when owners apply for land-use permits. *Koontz*, 133 S. Ct. at 2594. *Nollan* and *Dolan* stand for the proposition that the government may not condition approval of a land-use permit on the owner's relinquishment of a portion of his property unless there is a nexus and rough proportionality between the government's demand and the effects of the proposed land use. *Koontz*, 133 S. Ct. at 2591. In *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 702-03, 119 S. Ct. 1624, 143 L. Ed. 2d 882 (1999), the Supreme Court made clear the limited scope of the *Nollan/Dolan* test:

> [W]e have not extended the rough-proportionality test of *Dolan* beyond the special context of exactions—land-use decisions conditioning approval of development on the dedication of property to public use. *See Dolan*, [512 U.S.] at 385; [*Nollan*, 483 U.S. at 841].

Later, in *Koontz*, 133 S. Ct. at 2599, the Court extended the *Nollan/Dolan* test to certain "monetary exactions."

The nexus test permits only those conditions necessary to mitigate a specific adverse impact of a proposal. *Nollan*, 483 U.S. at 837. The rough proportionality test *limits the extent of required mitigation measures* to those that are roughly proportional to the impact they are designed to mitigate. *Dolan*, 512 U.S. at 391.

## C.  OSF's Facial Challenge

### 1.  Challenged Master Program Provisions

Here, the Master Program imposed a standard 150-foot buffer for all freshwater and marine water shorelines. JCC 18.25.270(4)(e).[47] For residential development, the Master Program states that property owners are "encouraged, but not required, to provide public access to the shoreline." JCC 18.25.500(1)(i). "New multi-unit residential development, including subdivision of land into more than four parcels, is strongly encouraged to provide public access/open space area equal to at least 30 percent of the total development/subdivision area for use by development residents and the public." JCC 18.25.500(1)(i). The Master Program further states that "[n]ew or amended subdivisions, except those for lot line adjustment and lot consolidation purposes" shall provide

---

[47] OSF also cites to the county CAO to show that the Master Program requires that "as a mandatory condition on all new permit approvals" a buffer must be designated by legally binding document or easement and to show that the buffer areas must be retained in their natural condition. Br. of Appellant (OSF) at 45. *See* JCC 18.22.270, (5)(a); JCC 18.25.100(3)(t).

public access in accordance with the general public access provision of the Master Program, JCC 18.25.290. JCC 18.25.500(4)(g). The Master Program states, "Industrial and port uses located in shoreline jurisdiction should provide public access," also in accordance with the general public access provision of the Master Program, JCC 18.25.290. JCC 18.25.470(1)(d). And the Master Program states approval for applications to build beach access structures and for new docks or boating facilities should include public access provisions. *See* JCC 18.25.340(1)(i), .350(1)(f).

2.     FAILURE TO MAKE THRESHOLD FACIAL CHALLENGE SHOWING

OSF presents a *facial* challenge to these Master Program provisions.[48]  In contrast, the cases OSF relies on all present an *as-applied* challenge. *Nollan*, *Dolan*, and *Koontz* all present as-applied constitutional taking challenges to land-use permit processes. *See Nollan*, 483 U.S. at 831-32; *Dolan*, 512 U.S. at 391; *Koontz*, 133 S. Ct. at 2602.

To make out a "facial" takings claim, "the landowner must show that the *mere enactment* of the regulation constitutes a taking." *Guimont*, 121 Wn.2d at 605 (citing *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 493, 107 S. Ct. 1232, 94 L. Ed. 2d 472 (1987)). Our Supreme Court further elucidated this rule by stating,

> The test for a facial challenge is a high one, in part because the landowner has not presented any evidence about the particular impact of the regulation on his or her parcel of land. Thus, to succeed in proving that a statute on its face effects a taking by regulating the uses that can be made of property, the landowner must show that

---

[48] OSF cites to Master Program provision JCC 18.25.290(2)(l) for the proposition that "[t]he [Master Program] requires that landowners dedicate a public access easement across their land as a mandatory condition on certain development applications." Br. of Appellant (OSF) at 47. But this Master Program provision does not state that. The provision offers the general direction that "[p]ublic access easements and permit conditions shall be recorded on the deed of title and/or the face of a short or long plat as a condition running, at a minimum, for a period contemporaneous with the duration of the authorized land use. Recordation shall occur at the time of final plat approval or prior to final occupancy." JCC 18.25.290(2)(l).

> the mere enactment of the statute denies the owner of all economically viable use of the property.

*Guimont*, 121 Wn.2d at 605.

OSF does not make this threshold showing. The nature of the *Nollan*/*Dolan* test is fact specific. The nexus test permits only those conditions necessary to mitigate a specific adverse impact of a proposal, *Nollan*, 483 U.S. at 837, while the rough proportionality test limits the extent of the mitigation measures to those that are roughly proportional to the impact they are designed to mitigate. *Dolan*, 512 U.S. at 391. Given these limitations, it will be an unusual instance, at best, when the "mere enactment" of a restriction could be said to violate these standards of nexus and proportionality. *See Guimont*, 121 Wn.2d at 605. OSF has not shown that the mere enactment of the challenged Master Program provisions fails under either the nexus or proportionality standards. Therefore, OSF's facial challenge under *Nollan* and *Dolan* also fails.

OSF further argues that Washington courts have "long-recognized the viability of a facial takings claim brought under *Nollan* and *Dolan*," citing to three cases. Reply Br. of Appellant (OSF) at 21. All three cases are distinguishable. The first two cases, *Margola Associates v. City of Seattle*, 121 Wn.2d 625, 854 P.2d 23 (1993), and *Orion Corp. v. State*, 109 Wn.2d 621, 653-57,

747 P.2d 1062 (1987), do not apply the *Nollan/Dolan* nexus and proportionality tests to facial constitutional claims.[49]

The third case, from this court, *KAPO*, 160 Wn. App. at 270, considered whether a marine shoreline buffer requirement imposed under the GMA violated an impact fee statute, RCW 82.02.020. The *KAPO* court did not analyze whether the petitioners met the threshold showing for a facial constitutional takings challenge or even clarify that petitioners raised such a challenge. Rather, the *KAPO* court opined that the impact fee statute does not preclude a dedication of land or an easement within a proposed development if the local government can demonstrate that such dedication or easement is "'reasonably necessary as a direct result of the proposed development or plat to which the dedication of land or easement is to apply.'" 160 Wn. App. at 271 (quoting RCW 82.02.020). The *KAPO* court then applied the nexus and proportionality tests to determine if the ordinance violated RCW 82.02.020. 160 Wn. App. at 272-74. *KAPO* does not support the validity of OSF's facial challenge based on *Nollan* and *Dolan*.

OSF has not shown how the mere enactment of the challenged Master Program provisions has taken its property under the *Nollan/Dolan* test. Therefore, OSF's constitutional facial challenge fails.

---

[49] *Margola* merely cites to *Nollan* for the proposition that the government must pay compensation for physically occupying or authorizing a third party to occupy private property. 121 Wn.2d at 647. *Margola* does not apply the *Nollan/Dolan* test, but rather engages in the facial-challenge threshold showing that OSF failed to engage in: *Margola* analyzes whether a plaintiff class met the threshold facial challenge of whether the municipal ordinances at issue *lead to a physical invasion of property* by the government. 121 Wn.2d at 647. *Orion* dealt with an as-applied challenge, not a facial challenge. The *Orion* court also stated that for a constitutional taking facial challenge, the property owner must show that "the challenged regulation denied all economically viable use of his or her property." 109 Wn.2d at 656.

### III. BOARD DISMISSAL OF ABANDONED ARGUMENTS

OSF argues that the Board committed legal or procedural error when it refused to consider several of OSF's arguments, but concedes that any error was harmless. The DOE argues that because OSF fails to identify the issues it alleges were improperly dismissed by the Board and admits that any error was harmless, we should reject OSF's arguments of error. RAP 10.3(a)(6). We agree with the DOE.

OSF asserts that the Board committed "a legal or procedural error" because the Board refused to consider several of OSF's arguments below. Br. of Appellant (OSF) at 48. But OSF fails to specify what that error is, fails to identify what arguments the Board supposedly failed to consider, and concedes that the error "appears harmless." Br. of Appellant (OSF) at 48. "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." *Holland*, 90 Wn. App. at 538; RAP 10.3(a)(6). We hold that OSF gave only passing, unsupported treatment to this issue and do not consider it.

### IV. ATTORNEY FEES

OSF argues that if it prevails, it should be entitled to attorney fees and costs under Washington's "Equal Access to Justice Act," RCW 4.84.350, and RAP 18.1.

"Where a statute authorizes fees to the prevailing party, they are available on appeal as well as in the trial court." *Eagle Point Condo. Owners Ass'n v. Coy*, 102 Wn. App. 697, 716, 9 P.3d 898 (2000). RCW 4.84.350(1) governs awards of fees and expenses following judicial review of agency action and states that

> [e]xcept as otherwise specifically provided by statute, a court shall award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees, unless the court finds that the agency action was substantially justified or that circumstances make an award

unjust. A qualified party shall be considered to have prevailed if the qualified party obtained relief on a significant issue that achieves some benefit that the qualified party sought.

We decline to award OSF attorney fees because OSF is not the prevailing party. In conclusion, we reject OSF's arguments that the Board erred.

PART TWO – CAPR APPEAL

In response to CAPR's remaining arguments, we hold that (1) the Master Program adequately considered economic impacts and (2) the Board did not deny due process to CAPR.

I. CONSIDERATION OF ECONOMIC IMPACTS

A. SMA AND MASTER PROGRAM GUIDELINE REQUIREMENTS

CAPR argues that because the County did not include analysis in the Master Program of how it would affect economic issues, the Board erred when it found the Master Program conformed to the SMA and Master Program guidelines. CAPR also argues that the adoption of the Master Program violated ch. 43.21H RCW, the "State Economic Policy Act" (SECPA). We disagree.

1. APPLICABLE LAW

The SMA provides the Master Program requirements for incorporating social science: "[i]n preparing the master programs, and any amendments thereto, the [DOE] and local governments *shall to the extent feasible*: (a) [u]tilize a systematic interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts." RCW 90.58.100(1) (emphasis added). The SMA further clarifies that local governments shall also "*to the extent feasible* . . . (e) [u]tilize all available information regarding . . . economics." RCW 90.58.100(1) (emphasis added). The DOE and local governments shall also, *to the extent*

*feasible*, "[c]onduct or support such further research, studies, surveys and interviews *as are deemed necessary.*" RCW 90.58.100(1)(d) (emphasis added).

The scientific requirements for a Master Program are also reiterated in the Master Program guidelines that state local jurisdictions are to "identify and assemble the most current, accurate, and complete scientific and technical information *available* that is applicable to the issues of concern" and to base Master Program provisions on an analysis incorporating such information. WAC 173-26-201(2)(a) (emphasis added). The SMA also speaks to development priorities, noting that single-family residences are the most common form of shoreline development and are a priority use when developed in a manner consistent with control of pollution and prevention of damage to the natural environment. RCW 90.58.030(3)(e)(vi); s*ee also* WAC 173-27-040(2)(g); WAC 173-26-241(3)(j). And the SMA encourages that Master Programs speak to economic development through other types of uses:

> The master programs shall include, *when appropriate*, the following:
> (a) An economic development element for the location and design of industries, projects of statewide significance, transportation facilities, port facilities, tourist facilities, commerce and other developments that are particularly dependent on their location on or use of the shorelines of the state.

RCW 90.58.100(2) (emphasis added).

2.    BOARD DECISION

The Board concluded that the County factored regulatory compliance into its goals and regulations through consideration of economic "feasibility" required by RCW 90.58.020 and that CAPR failed to meet its burden to show the Master Program failed for lack of support from social sciences. The Board further concluded that neither the SMA in RCW 90.58.100(1) nor the Master

Program guidelines in WAC 173-26-201(2)(a) required the type of economic analysis suggested by CAPR.

3.    ANALYSIS

CAPR argues that the Board erred because the Master Program violated the SMA and Master Program guidelines cited above. CAPR rests this argument on its claim that the Master Program did not include an economic analysis about how the Master Program would affect residential property values, property insurance rates, opportunities for financing and refinancing, costs of regulatory compliance, property tax collections, and tax burden distributions across the County.[50] But as the Board concluded, neither the SMA nor the Master Program guidelines required this type of economic analysis. *See* RCW 90.58.100(1)(a), (d), (e), (2)(a), .030(3)(e)(vi); WAC 173-26-201(2)(a).

The SMA requires local governments, *to the extent feasible*, to incorporate social sciences into the Master Program, to utilize *available* information regarding economics, and to conduct or support further research as is deemed necessary. RCW 90.58.100(1)(a), (d), (e). CAPR bears the burden of establishing the invalidity of the Master Program. *Quadrant Corp.*, 154 Wn.2d at 233. But CAPR provides no support for its proposition that it was feasible for the County to incorporate into the CIA additional, available economic information that was needed to analyze the economic effects of the Master Program. Nor does CAPR demonstrate that the County should have conducted any further economic research.

---

[50] CAPR cites to *Armstrong v. United States*, 364 U.S. 40, 49, 80 S. Ct. 1563, 4 L. Ed. 2d 1554 (1960). But *Armstrong* considered a Fifth Amendment takings claim that is a claim that CAPR does not assert. *See* 364 U.S. at 49.

Further, the record supports the Board's conclusion that the County solicited, considered, and incorporated the economic feasibility of regulatory compliance into the Master Program. During the 2008 to 2009 comment period, the County received public comment, including that submitted by CAPR, inquiring about the economic impact of the Master Program. The CIA reported public requests for analysis of the economic impacts of the Draft Master Program, but noted it did not contain such an assessment because none is required at the local level. The CIA further noted that there was no evidence of decreased waterfront property values over the past 40 years under SMA regulation.

The CIA also contained recommendations that developments that have unanticipated or uncommon impacts, which cannot be reasonably identified during the drafting of the Master Program, should be evaluated via the shoreline substantial development and conditional use permit process. This process would ensure that all impacts are addressed and that there is no net loss of ecological function after mitigation.

The Master Program included numerous provisions in which application of shoreline regulations and restrictions are conditioned on the *feasibility* of such restrictions.[51] The Master Program states that whether an action, including a development project, mitigation, or preservation requirement is infeasible depends on weighing relative public costs and public benefits. JCC

---

[51] *See* JCC 18.25.180(2)(c), .210(3)(a)(i), .290(1)(j), (2)(d), (e), (j), .310(2)(c), .340(1)(f), (4)(f), .350(1)(h), (6)(j)(i), (ii), (7)(c)(ii), .380(1)(d), (f)(ii), .410(1)(c), (l), (m), .450(6)(c)(ii), .470(1)(g), (5)(c)(ii), (6)(a)(i), .480(1)(d)(iii), .490(1)(d), (3)(c), .500(4)(e), (f)(ii), (h), .520(1)(a), (j), (3)(d), (e), (f), .530(1)(a)(ii), (c), (g), (2)(d), (e), (f), (3)(a), (b), (d)(viii), (ix), (5)(c), (8)(a), (b).

18.25.100(6)(b). More importantly, the definition of feasible alternatives includes ones that can be accomplished at reasonable cost. JCC 18.25.100(6)(c)(i)(D).[52]

The record shows that the County utilized economic information. The CIA acknowledged citizens' requests about the economic impacts of the Draft Master Program. And the CIA noted that there is no evidence of decreased waterfront property values over the past 40 years under SMA regulation. The Master Program's bibliography further evidences the County's reliance on sources that address economics.[53] CAPR fails to explain why the incorporation of economics into the Master Program and the County's evidence that the Board deemed sufficient under the SMA and Master Program guidelines are not sufficient. We hold that the Board did not err by concluding that the SMA and Master Program guidelines did not require the economic analysis advocated for by CAPR.

---

[52] CAPR argues that the Master Program feasibility provisions lack economic analysis, inure against property owners, and fail to meet the requirements of RCW 90.58.100(1)(a). But CAPR does not explain or establish how these alleged deficiencies violate either the SMA or the Master Program guidelines. "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." *Holland*, 90 Wn. App. at 538; *see also* RAP 10.3(a)(6).

We do not consider claims unsupported by legal authority. RAP 10.3(a)(6); *Cowiche Canyon*, 118 Wn.2d at 809.

[53] CAPR cites to the 612 entries in the Master Program's bibliography to contend that there is *no* mention of the economic impacts of the Master Program. The bibliography lists only titles of articles, web sites, or other resources. Based on titles alone, it is impossible to discern what of these resources the County relied on to create the Master Program. But just based on titles alone, some of the resources appear to address some of the economic issues CAPR raises here. AR at 2393 (e.g., "Efficacy and Economics of Riparian Buffers on Agricultural Lands"); AR at 2394 (e.g., "Sound Science: Synthesizing ecological and socioeconomic information about the Puget Sound ecosystem"); AR at 2400 ("Critical Areas Assistance Handbook: Protecting Critical Areas Within the Framework of the Washington Growth Management Act, Washington State Department of Community, Trade and Economic Development").

## B. STATE ECONOMIC POLICY ACT

CAPR argues that the adoption of the Master Program violated SECPA. We disagree.

### 1. APPLICABLE LAW

The SECPA ensures "that economic values are given appropriate consideration along with environmental, social, health, and safety considerations in the promulgation of rules by state and local government." RCW 43.21H.010. The SECPA's legislative responsibility provision states,

> All state agencies and local government entities *with rule-making authority* under state law or local ordinance must adopt methods and procedures which will insure that economic impacts and values *will be given appropriate consideration in the rule-making process* along with environmental, social, health, and safety considerations.

RCW 43.21H.020.

### 2. BOARD DECISION

The Board did not address this issue.

### 3. ANALYSIS

CAPR cites to the SECPA's purpose provision and legislative responsibility section above and argues that the County had no proper procedures in place to comply with these provisions. CAPR further asserts that the County should have anticipated, quantified, and considered the economic effects of the "stigma" associated with nonconforming uses and structures resulting from the Master Program and that the DOE should have ensured that the County took these steps prior to approving the Master Program.

These arguments are unpersuasive because the SECPA provisions do not delineate such requirements. *See* RCW 43.21H.010, .020. And CAPR does not cite to any other portion of the SECPA, other legal authority, or the record to support this argument. We do not consider claims

unsupported by legal authority or the record. RAP 10.3(a)(6); *Cowiche Canyon*, 118 Wn.2d at 809.

Further, as analyzed above, the record demonstrates that the County considered economic information. CAPR fails to explain why the incorporation of economics into the Master Program, the County's evidence, and the County and the DOE's processes do not fulfill SECPA's mandates. We hold that the Master Program update did not violate SECPA as argued by CAPR.

## II. NEUTRAL TRIBUNAL

CAPR argues a violation of their due process right to a neutral tribunal (1) because the Board's standard of review for a Master Program involves a presumption of validity and (2) because the Board is not an impartial or detached judicial body. From this, CAPR contends it was denied proper adjudication. We disagree.

## A. PRINCIPLES OF LAW

Constitutional issues are questions of law that we review de novo. *Ass'n of Wash. Spirits*, 182 Wn.2d at 350. Challenges to a Master Program are governed by the SMA and are adjudicated by the Board. RCW 90.58.190(2)(a). The Board reviews Master Programs for compliance with the SMA and the Master Program guidelines. RCW 90.58.190(2), .200, .060; WAC 173-26-171 to -251; RCW 36.70A.280.

Where a provision regulating SSWS is challenged, "the board shall uphold the decision by the [DOE] unless the board, by clear and convincing evidence, determines that the decision of the [DOE] is noncompliant with the policy of RCW 90.58.020 or the applicable guidelines, or chapter 43.21C RCW as it relates to the adoption of master programs." RCW 90.58.190(2)(c). And where a challenge is to provisions regulating shorelines, the Board shall review the proposed Master

Program "*solely* for compliance with the requirements," the applicable guidelines, and other internal consistency provisions. RCW 90.58.190(2)(b) (emphasis added). With respect to provisions affecting only shorelines, a petitioner must establish that the provisions at issue are "clearly erroneous" in view of the entire record before the Board. RCW 36.70A.320(3).

The Board was established under the GMA, which states that the "legislature intends that the board applies a more deferential standard of review to actions of counties and cities than the preponderance of the evidence standard provided for under existing law." RCW 36.70A.3201. The GMA further clarifies the reasoning behind the deference given to Board decisions:

> Local comprehensive plans and development regulations require counties and cities to balance priorities and options for action in full consideration of local circumstances. The legislature finds that while this chapter requires local planning to take place within a framework of state goals and requirements, the ultimate burden and responsibility for planning, harmonizing the planning goals of this chapter, and implementing a county's or city's future rests with that community.

RCW 36.70A.3201.

### B. APPLICATION OF THE LAW TO THE FACTS

CAPR argues that the Board's standards of review under the SMA, RCW 90.58.190, and the GMA, RCW 36.70A.320, deny challengers of Master Programs their due process rights to a neutral tribunal.[54] In support of its argument, CAPR relies on *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 113 S. Ct. 2264, 124 L. Ed. 2d 539 (1993), *Ward v. Village of Monroeville, Ohio*, 409 U.S. 57, 93 S. Ct. 80, 34 L. Ed. 2d 267 (1972), and *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 100 S. Ct. 1610, 64 L. Ed. 2d 182 (1980). CAPR's reliance on these cases is unpersuasive.

---

[54] The Board did not review this issue.

First, in *Guimont v. City of Seattle*, 77 Wn. App. 74, 86 n.10, 896 P.2d 70, *review denied*, 127 Wn.2d 1023 (1995), Division One of this court held that *Concrete Pipe*'s rationale applies to only federal economic legislation. CAPR argues that *Guimont*'s holding is a "crabbed reading that this Court needs to revisit." Br. of Appellant (CAPR) at 47 n.21. But it is difficult to discern how CAPR would apply *Concrete Pipe* here.

CAPR fails to analyze how or why we should apply *Concrete Pipe* when that opinion specifically analyzed the due process implications within the context of a complex federal employer pension plan statute. We are not persuaded to deviate from *Guimont* and thus do not apply *Concrete Pipe* here.

Second, *Ward* does not support CAPR's argument. In *Ward*, the "mayor's court" convicted a defendant of two traffic offenses in the Village of Monroeville. 409 U.S. at 57-58. There, the Supreme Court held that the defendant was denied a trial before a disinterested and impartial judicial officer as guaranteed by the due process clause as a result of the mayor's financial interest and role in collection activities. *Ward*, 409 U.S. at 58. Here, besides noting that the Board is not an elected body, CAPR offers *no analysis or record support* to show a conflict of interest exists between the Board and its reviewing capacity that is similar to that between the mayor and his duties in *Ward*.

Third, *Marshall* does not support CAPR's argument either. The Supreme Court held that the civil penalty provisions of the Fair Labor Standards Act, 29 U.S.C. § 216(e), did not violate the due process clause by creating an impermissible risk of bias in the enforcement and administration of the Fair Labor Standards Act. *Marshall*, 446 U.S. at 241-42. The *Marshall* Court acknowledged the due process requirement of neutrality of officials performing judicial or

quasi-judicial functions. 446 U.S. at 242. And the *Marshall* Court stated that under the Fair Labor Standards Act, the administrative law judge is required to conduct a *de novo* review of all factual and legal issues. 446 U.S. at 245.

Here, the sum of CAPR's argument and analysis is that the Board "is not impartial or detached, and its review is not *de novo*." Br. of Appellant (CAPR) at 48. Without cite to the record or legal analysis, we cannot evaluate the potential of bias here as the Supreme Court did in *Marshall*. The GMA states that the legislature intended for the Board to grant local government and agency regulations like the Master Program deference given the required consideration of local circumstances. RCW 36.70A.3201. CAPR fails to demonstrate bias by the Board here. We hold that CAPR has not shown that the Board's standard of review is improper nor that the Board's review violated CAPR's due process rights.

### III. ATTORNEY FEES

CAPR argues that if it prevails, it should be entitled to attorney fees and costs under Washington's Equal Access to Justice Act, RCW 4.84.350. Because CAPR does not prevail on appeal, we decline to award CAPR attorney fees.

In conclusion, we reject CAPR's arguments that the Board erred.

### PART THREE – S&G APPEAL

### I. ISSUE PRESERVATION

S&G also argues that (1) based in part on the findings in the 2004 Overlay, the Board erred when it found S&G's mining operation was not a water-dependent use that the SMA requires be prioritized and (2) the Master Program conflicts with the "Aquatic Lands Act," ch. 79.105 RCW, and the "Surface Mining Act," ch. 78.44 RCW. The DOE and the County argue that we should

not consider these challenges because they were not raised to the Board.[55] We hold that S&G's arguments related to the Overlay findings are preserved such that they may raise them here, but that S&G's argument regarding the Aquatic Lands Act and the Surface Mining Act cannot be raised here for the reasons below.[56]

### A. APPLICABLE LAW

Issues not raised before the agency may not be raised on appeal unless the party seeking to raise a new issue shows an exception to this rule applies. RCW 34.05.554(1). Where no authorities are cited in support of a proposition, we are not required to search out authorities, but may assume that a diligent search has produced none. *Frank Coluccio Constr. Co. v. King County*, 136 Wn. App. 751, 779, 150 P.3d 1147 (2007) (quoting *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962)).

### B. ANALYSIS

First, contrary to the County's assertion, S&G does not argue on appeal that the Master Program is invalid because it is inconsistent with the Overlay. Rather, using the Overlay findings

---

[55] The County also argues that S&G may not have standing and that S&G's challenge may be moot. But the County does not provide legal authority related to standing or mootness. We do not consider claims unsupported by legal authority or argument. RAP 10.3(a)(6); *Cowiche Canyon*, 118 Wn.2d at 809. Thus, we do not consider the County's standing and mootness claims.

[56] The DOE and the County also argue that because the Board found S&G abandoned the issue of whether the Master Program was inconsistent with the SMA and GMA, that issue is not properly before this court. The County relies on RCW 34.05.554 and *Concerned Coupeville Citizens v. Town of Coupeville*, 62 Wn. App. 408, 412-13, 814 P.2d 243 (1991). RCW 34.05.554 states that issues not raised before the agency may not be raised on appeal. Arguably S&G raised the issue of the Master Program's consistency with the SMA and the GMA before the Board. Because the County does not demonstrate that an issue held abandoned by the Board effectively also means it was not raised to the Board under RCW 34.05.554, we address the issue.

as supporting evidence for the first time on appeal, S&G argues, as it argued below to the Board, that the Master Program violates the SMA and the Washington Constitution because it prohibits a water-dependent use. The County provides no authority for the proposition that S&G cannot cite to evidence like the Overlay findings for the first time on appeal in support of an issue it raised to the Board. Where no authorities are cited in support of a proposition, we are not required to search out authorities. *Frank Coluccio Constr. Co.*, 136 Wn. App. at 779. Thus, we hold that S&G's arguments that incorporate reference to the Overlay findings are preserved on appeal.

Second, S&G did not raise to the Board the issue that the Master Program was inconsistent with the Aquatic Lands Act. Issues not raised before the agency may not be raised on appeal unless an exception applies. RCW 34.05.554(1). And S&G does not argue any exception applies allowing it to raise the issue now. We hold that S&G cannot raise the Aquatic Lands Act on appeal, and therefore we do not address its related argument.

Third, in a one-sentence argument to the Board, S&G raised the issue of the Master Program's inconsistency with the Surface Mining Act. And here, in support of its argument that the Master Program conflicts with the Surface Mining Act, S&G merely quotes provisions of the Surface Mining Act and makes *no* argument in support of this assertion. "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." *Holland*, 90 Wn. App. at 538; RAP 10.3(a)(6). Thus, we hold that S&G's argument related to the Surface Mining Act does not merit judicial consideration, and we do not consider that argument.

II.  S&G's Operations are Water Related

S&G argues that the Board erroneously interpreted or applied the relevant law, *Preserve Our Islands v. Shorelines Hearings Board*, 133 Wn. App. 503, 137 P.3d 31 (2006), to find S&G's

operations were water related rather than water dependent. We disagree. Even assuming the distinction between water related and water dependent is relevant,[57] S&G's argument still fails.

## A. STANDARD OF REVIEW AND APPLICABLE LAW

We may grant relief from the Board's decision if it has erroneously interpreted or applied the law. *City of Redmond*, 136 Wn.2d at 46. We give weight and deference to the Board's interpretation of statutes and regulations it enforces, but ultimately our review is de novo. *Quadrant Corp.*, 154 Wn.2d at 233.

Under Master Program guidelines, "'[w]ater-dependent use'" means "a use or portion of a use *which cannot exist in a location* that is not adjacent to the water and which is dependent on the water by reason of the intrinsic nature of its operations." WAC 173-26-020(39). "'Water-related use'" means

> a use or portion of a use which is not intrinsically dependent on a waterfront location but whose economic viability is dependent upon a waterfront location because:
> (a) The use has a functional requirement for a waterfront location such as the arrival or shipment of materials by water or the need for large quantities of water; or
> (b) The use provides a necessary service supportive of the water-dependent uses and the proximity of the use to its customers makes its services less expensive and/or more convenient.

WAC 173-26-020(43).

---

[57] The Coalition argues that because the County was not obligated under the SMA or Master Program guidelines to allow mining or mining-related marine activity on all shoreline environments—whether or not water dependent—whether S&G's mining operation is water dependent or water related is largely irrelevant.

## B. BOARD DECISION

The Board found that "[S&G's] proposed mining operation is not 'dependent on the water by reason of the **intrinsic nature** of its operations'" because it has the option of road transportation for aggregates. AR at 7544. The Board determined that this fact was in contrast with *Preserve Our Islands* in which the mining operation at issue was on an island and was dependent on water transportation. The Board made this conclusion in order to answer S&G's argument that in violation of the SMA and WAC 173-26-186, the Master Program impermissibly treated two water-dependent uses—salmon net pens and aggregate material transport—inconsistently by allowing the former and prohibiting the latter. The Board generally found that the Master Program correctly classified mining in the County as "water related" and noted it was not completely prohibited, but was allowed in the Master Program in high-intensity designated areas. And the Board found that S&G failed to meet its burden to show that the Master Program violated the SMA or Master Program guidelines for prohibiting mining in some instances.

## C. ANALYSIS

In *Preserve Our Islands*, the Preserve Our Islands group and King County appealed the Shorelines Hearings Board order requiring the County to issue Glacier Northwest mine a conditional use permit to build a barge-loading facility on the shoreline of Maury Island. 133 Wn. App. at 509. Glacier owned a 235-acre mine on the shore of Maury Island, with the mine itself located in an upland portion of the site. 133 Wn. App. at 510. The King County Master Program designated the area in which Glacier's barge facility would be built as a conservancy area. *Pres. Our Islands*, 133 Wn. App. at 514. But the King County Master Program also allowed for such a

barge-loading facility to be permitted if the project was deemed water dependent. *Pres. Our Islands*, 133 Wn. App. at 516-17.

The Board found that the barge-loading facility was water dependent and should be awarded a conditional use permit. *Pres. Our Islands*, 133 Wn. App. at 513. *Preserve Our Islands* upheld the Board decision that the facility was water dependent based on a number of factors, including: that the County zoned *Glacier's entire site* for commercial mining and designated it as mineral resource land *without any restrictions* on the size of use, that the mine was located on a small island without viable large-scale ground transportation options, and that the mine could not *operate* consistently with its designated principal use without barging. 133 Wn. App. at 526. *Preserve Our Islands* further held that the barge-loading facility was an integral and necessary part of Glacier's principal use and that the entire facility must use the shorelines to operate consistently with its county zoning as a commercially significant mining operation. 133 Wn. App. at 526.

*Preserve Our Islands* is distinguishable from this case for several reasons. The record supports the Board's finding that, unlike the use at issue in *Preserve Our Islands*, S&G's mining operation is *not on an island* and can exist without the approval of the shoreline pit-to-pier project with overland transportation. JCO 08-0706-04 at 18. The Overlay ordinance specifically stated that the quantity of product moved by truck from S&G's mine will increase by 50 percent over the next decades whether or not the marine transport system is allowed. JCO 08-0706-04 at 18. The record does not demonstrate that, as in *Preserve Our Islands*, S&G's pier is an integral and necessary part of S&G's principal use such that it "must use" the shorelines in order to operate its mine. 133 Wn. App. at 526-27.

The Overlay ordinance stated that installation of a marine transport pier would increase S&G's mining and would allow it to sell its product more competitively in more distant markets than it could using only trucks because truck transport is too costly to the end user. JCO 08-0706-04 at 18. The Overlay ordinance further clarifies that marine transport from the pit-to-pier project would not entirely replace truck traffic to get the aggregate to market. JCO 08-0706-04 at 18.

Thus, marine transportation from a shoreline pier and barge could make extra profit and business for S&G, but S&G has not shown that the pit-to-pier project was necessary and integral to its mining operations, the way the requested pier was for Glacier, on an island, making it water dependent in *Preserve Our Islands.* 133 Wn. App. at 513. S&G's pit-to-pier project in the context of its mining operation thus appears to be more like a "water-related" use that is not intrinsically dependent on a waterfront location but for which economic viability is dependent on a waterfront location. WAC 173-26-020(43).

Although our review of the Board's decision based on its interpretation of the law is de novo, we give weight and deference to the Board's interpretation of the statutes and regulations it enforces. *Quadrant Corp.*, 154 Wn.2d at 233. In light of the factual findings in the Overlay ordinance and the differing facts in *Preserve Our Islands*, we hold that the Board did not err when it distinguished *Preserve Our Islands* from S&G's claims. We give deference to the Board's interpretation of the Master Program guidelines when it found that S&G's operation was water related, not water dependent. Thus, we hold that the Board did not err when it classified S&G's use as water related rather than water dependent.

### III.  NO CONFLICT WITH THE GMA AND THE GMA COMPREHENSIVE PLAN

S&G next argues that the Master Program's mining limitation is inconsistent with and violative of the GMA[58] and the County's GMA Comprehensive Plan.[59]  The Coalition argues that the SMA states that Master Programs are not reviewable under the GMA and that S&G fails to demonstrate inconsistency between the Master Program and the GMA Comprehensive Plan.  The DOE argues that a Master Program need be consistent with only the Master Program guidelines, not the GMA as a whole.[60]  We disagree with S&G's contentions.[61]

---

[58] S&G argues that because the Board failed to address this issue, we should remand this matter to the Board to "complete its work."  Br. of Appellant (S&G) at 9.  But S&G provides no law or legal analysis explaining how the Board made a procedural error by not addressing this issue.  We do not consider claims unsupported by legal authority or argument.  RAP 10.3(a)(6); *Cowiche Canyon*, 118 Wn.2d at 809.  Thus, we do not consider whether the Board made such a procedural error.

[59] S&G also argues that the Master Program "violates the mandates of its own" provisions because the Master Program simultaneously *prohibits* marine transport of minerals and *supports* mining operations, including marine transport.  Br. of Appellant (S&G) at 23.  This argument is unpersuasive.  In support of the argument, S&G cites to JCC 18.25.480(4)(b).  Master Program provision JCC 18.25.480(4)(b) states that mining operations include "[t]ransport of minerals" from conveyor systems and barge terminals.  And the Master Program prohibits mining use and development except mining transport by road within most shoreline environments, including "conservancy" shoreline environments.  JCC 18.25.480(3)(d).  But the Master Program allows mining, including mine-related transportation, in the "high-intensity" shoreline environments with conditional use permits.  JCC 18.25.480(3)(f).  Thus, the fact that transport is included in the Master Program definition of mining operations and the fact that one provision of the Master Program prohibits transport in particular areas with particular environmental designations does not mean the Master Program violates its own provisions.  We hold that this argument fails.

[60] The DOE also argues that S&G has waived this issue because S&G did not raise it before the Board.  But then in a footnote, the DOE acknowledges that S&G did raise the issue before the Board, but that it did so inadequately.  We hold that this issue is not waived.

[61] Notably, the Board did not address whether the Master Program violated the GMA generally.  The Board found that the Master Program did not violate the GMA provisions requiring Master Programs to be consistent with GMA *Comprehensive Plans*.  And the Board found that S&G had

No. 47641-0-II

A.  VIOLATION OF THE GMA

RCW 90.58.190 sets out the SMA rules for appeal to the Board of the adoption or amendment of a Master Program.  Where an appeal to the Board concerns shorelines, the Board shall review the Master Program

> *solely* for compliance with the requirements of this chapter, the policy of RCW 90.58.020 [SMA] and the applicable guidelines, the *internal consistency provisions* of RCW 36.70A.070 [a GMA provision specifying what must be contained in *GMA Comprehensive Plans*], 36.70A.040(4) [a GMA provision specifying who must implement a *GMA Comprehensive Plan* and when], 35.63.125, and 35A.63.105 [both planning commission provisions], and chapter 43.21C RCW [SEPA] as it relates to the adoption of master programs and amendments under chapter 90.58 RCW [SMA].

RCW 90.58.190(2)(b) (emphasis added).  If the appeal to the Board concerns a SSWS, the Board shall uphold the DOE's decision unless the Board, "by clear and convincing evidence, determines that the decision of the [DOE] is noncompliant with the policy of [SMA] RCW 90.58.020 or the applicable guidelines, or chapter 43.21C RCW [SEPA] as it relates to the adoption of master programs and amendments under this chapter."  RCW 90.58.190(2)(c).

The County has some shorelines that are reviewable under RCW 90.58.190(2)(b) and others that are reviewable under RCW 90.58.190(2)(c).  The Board thus examined the County's Master Program under both SSWS and shoreline scopes of review and applicable burdens of

---

abandoned an argument that the Master Program was inconsistent with two GMA definition sections for lack of legal argument.

97

proof.[62] But under either review, there is no requirement that the Master Program be consistent with the GMA beyond the provisions listed in RCW 90.58.190(2)(b), above. RCW 90.58.190(2)(b), (c).[63] The SMA clarifies that a Master Program must be consistent with a *GMA Comprehensive Plan* and *county planning efforts for a GMA Comprehensive Plan*, but does not state that Master Programs are evaluated based on the provisions in the GMA as a whole. RCW 90.58.190(2)(b); former RCW 36.70A.070 (2010); RCW 36.70A.040(4). Because a Master Program is not reviewed for compliance with the GMA beyond these specific provisions, we hold that S&G's argument fails.

### B. VIOLATION OF THE GMA COUNTY COMPREHENSIVE PLAN

To support its argument that the Master Program mining limitation is inconsistent with and thereby violative of the County's GMA Comprehensive Plan, S&G cites to many GMA Comprehensive Plan policies regarding sustainable development of industrial uses for mineral resource lands. S&G then asserts that the Master Program "improperly nullifies these GMA-based policies." Br. of Appellant (S&G) at 25. The Coalition argues that S&G has failed to carry its

---

[62] The DOE and the Coalition argue that because Hood Canal shorelines are classified as SSWS, the standard of reviewing the Master Program's mining provision is limited to that set for SSWS. The DOE and the Coalition are correct that S&G frames its argument using the example of the prohibition of its pit-to-pier project, but it appears that S&G is challenging the entire Master Program provision prohibiting mining in conservancy areas. Thus, we consider the standards of review for SSWS and shorelines. The Coalition seems to acknowledge this because it also analyzes both standards of review.

[63] The GMA also does not require Master Programs be reviewed under the GMA. The GMA confirms that a Master Program should be adopted pursuant to the SMA rather than the GMA. *See* RCW 36.70A.480(2). As noted, the SMA through RCW 90.58.190(2)(b) lists those provisions under which a Master Program is reviewed.

burden of demonstrating internal inconsistency between the Master Program and the County's GMA Comprehensive Plan goals. We agree with the Coalition.

Under the APA, the party asserting invalidity bears the burden of establishing the invalidity. *Quadrant Corp.*, 154 Wn.2d at 233. As is common, the County's GMA Comprehensive Plan contains policies that may conflict in their application, such as those encouraging both industrial development and environmental protection. WAC 173-26-176(2) (stating, "The policy goals for the management of shorelines harbor potential for conflict"). S&G fails to offer legal argument to show how the Master Program provision at issue nullifies the County's GMA Comprehensive Plan policies thereby making the Master Program invalid. We agree with the Coalition and hold that S&G's argument fails.

In conclusion, we reject S&G's arguments that the Board erred.

## CONCLUSION

After review of the parties' arguments and the record herein, we conclude that the Board's final decision and order that upheld the County's Master Program was not error. We affirm.

JOHANSON, J.

We concur:

BJORGEN, C.J.

MELNICK, J.